United States Court of Appeals,

Eleventh Circuit.

Nos. 95-9066, 95-9085 and 95-9165.

UNITED STATES of America, Plaintiff-Appellee,

v.

Thomas Lowrance KUMMER, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Robert Jerva JERNIGAN, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

John E. OGLESBY, Defendant-Appellant.

Aug. 2, 1996.

Appeals from the United States District Court for the Southern District of Georgia. (No. CR494-165), B. Avant Edenfield, Chief Judge.

Before EDMONDSON and DUBINA, Circuit Judges, and LOGAN[*], Senior Circuit Judge.

LOGAN, Senior Circuit Judge:

In these consolidated direct criminal appeals, defendants Thomas Kummer (No. 95-9066), John Oglesby (No. 95-9165), and Robert T. Jernigan (No. 95-9085) appeal from sentences imposed after they each pleaded guilty to one count of violating 18 U.S.C. § 1954 ("Offer, acceptance, or solicitation to influence operations of employee benefit plans")[1] pursuant to plea agreements. Defendants

---

[*]Honorable James K. Logan, Senior U.S. Circuit Judge for the Tenth Circuit, sitting by designation.

[1]Initially Kummer was charged with and pleaded guilty to conspiracy to violate the statute, under 18 U.S.C. § 371. The court then determined that Kummer pleaded guilty without knowing

argue that the district court erred in sentencing them for involvement in a bribe rather than a gratuity, which they assert was the charge and the plea to which they agreed. Alternatively defendants Kummer and Jernigan contend they should be allowed to withdraw their guilty pleas. Defendants also individually allege various errors by the district court related to sentencing.

I

Defendant Jernigan was the business agent and financial secretary for the United Brotherhood of Carpenters Local 256 in Savannah, Georgia; he was also trustee of the local's health and welfare plan, an employee benefit plan. His union needed to obtain a loan to assist in financing its union hall, and he asked defendant Oglesby for assistance in that matter. Oglesby was the general representative of the Brotherhood of Carpenters International Union in the southeastern United States. Oglesby and Jernigan had worked together because of Jernigan's representation of the local union and Oglesby's work with the international office. In response to Jernigan's request for assistance in obtaining a loan for the union hall, Oglesby told Jernigan about his associates Thomas Kummer and Edward Killian who were involved in the Tahoe Company, a real estate development company located in Reno, Nevada. Kummer was general counsel of Tahoe; Killian was acting vice president and secretary of Tahoe, as well as being a member of the board of directors of Commercial Pacific Savings and

---

that the conspiracy charge carried a five-year statutory maximum penalty, and it allowed him to plead to a new information charging the substantive offense of 18 U.S.C. § 1954 which has a three-year statutory maximum penalty.

Loan (Compac). Tahoe was engaged in soliciting investments from business agents of union benefit plans in exchange for promoting union labor and construction projects developed by Tahoe.

Following Oglesby's advice, Jernigan talked to Killian about getting a loan for the union hall. Jernigan also told Killian that he needed to refinance a mortgage on the house where he lived. Killian suggested that Compac might be able to make Jernigan a personal loan. Killian sent Jernigan a personal loan application, which Compac denied because of his poor credit rating. Oglesby then told Jernigan that Tahoe was receiving investments from local unions and that if an investment was made from Jernigan's local union it would increase the possibility that he would receive the personal loan he was seeking. Jernigan then called Killian, who told him that an investment from the health and welfare plan would "just about secure any type of loan" for which Jernigan applied. Oglesby Presentence Report (PSR) at ¶ 5; 2 R. at 15 (No. 95-9085). Killian advised Jernigan to ask his girlfriend, Lori Stone, to apply for the refinancing loan in her name because Stone's credit rating was better than Jernigan's. Killian apparently told Oglesby that a personal loan would have to be made to Jernigan to make sure that he would invest approximately $250,000 from the health and welfare plan in Tahoe. Oglesby Presentence Report at WW 4, 6. On February 2, 1990, Jernigan wired $253,041.84 from the union's health and welfare plan to Compac to purchase Tahoe stock. In making this transfer Jernigan did not obtain the required authorization of another representative of the health and welfare plan. On February 5, 1990, Jernigan received an $85,000 loan from

Compac secured by a $95,000 certificate of deposit that Tahoe obtained using the funds Jernigan had wired to Tahoe.

On February 21, 1990, in a recorded conversation defendant Kummer told David Brumbeloe, a Tahoe shareholder, that he had called Jernigan to persuade him to purchase the stock with funds from the union's health and welfare plan. Kummer indicated that in return Tahoe would ensure that Jernigan received the home loan.

On March 31, 1990, Jernigan received from Tahoe a $6,000 check made out to him but which he was to deliver to Waylon Morton, a business agent of the union local in Macon, Georgia. Morton had requested a cash payment from Tahoe before he would agree to use union annuity funds to purchase shares of Tahoe stock. Jernigan, however, cashed the check and spent the money. On May 8, 1990, Morton invested $78,586.72 from his union's annuity plan with Tahoe. The following July 2 Killian sent a $6,000 payment to Morton as a result of his earlier investment.

Oglesby received $29,900 over a period of time in fees, loans and expense reimbursements from Tahoe; some of this money was obtained through a personal loan made to him by Compac based on Killian's authorization.

After a lengthy investigation by the Department of Labor, defendants were charged by information with violating 18 U.S.C. § 1954, "Offer, acceptance, or solicitation to influence operations of employee benefit plan." Section 1954, as pertinent, provides that:

Whoever being—

(1) an administrator, officer, trustee, custodian, counsel, agent, or employee of any employee welfare benefit

plan or employee pension benefit plan; or

> (2) an officer, counsel, agent, or employee of an employer or an employer any of whose employees are covered by such plan; or

> (3) an officer, counsel, agent, or employee of an employee organization any of whose members are covered by such plan; or

> (4) a person who, or an officer, counsel, agent, or employee of an organization which, provides benefit plan services to such plan

> receives or agrees to receive or solicits any fee, kickback, commission, gift, loan, money, or thing of value because of or with intent to be influenced with respect to, any of his actions, decisions, or other duties relating to any question or matter concerning such plan or any person who directly or indirectly gives or offers, or promises to give or offer, any fee, kickback, commission, gift, loan, money, or thing of value prohibited by this section, shall be fined under this title or imprisoned not more than three years, or both.

18 U.S.C. § 1954.

Although § 1954 does not use the term "bribe" or "gratuity," the courts have noted that the language "because of, or with intent to be influenced" corresponds with a "bribe/gratuity dichotomy." *United States v. Lopreato,* 83 F.3d 571, 575 (2d Cir.1996). The "with intent to be influenced" language prohibits a bribe, which involves a quid pro quo. *Id.; see also United States v. Mariano,* 983 F.2d 1150, 1159 (1st Cir.1993) (a bribe involves intention of briber to gain quid pro quo); *United States v. Muldoon,* 931 F.2d 282, 287 (4th Cir.1991) (payer's *intent* to influence recipient's actions distinguishes bribe from gratuity). The "because of" language prohibits a gratuity, which involves no quid pro quo, but is a payment made "because of the act." *Muldoon,* 931 F.2d at 287.

Unlike other federal statutes prohibiting bribes and gratuities, § 1954 provides the same maximum penalty for violation

of the "because of" (gratuity) or the "intent to be influenced" (bribe) language of the statute. *See* 18 U.S.C. § 1954 (providing maximum of three years imprisonment); *cf.* 18 U.S.C. § 201(b) (bribery of public official or witness) (maximum penalty fifteen years) and *id.* § 201(c) (gratuity) (maximum penalty two years). The Sentencing Guidelines that apply to § 1954, however, do make a distinction between a bribe and a gratuity, providing for a base offense level often for a bribe and six for a gratuity. USSG § 2E5.1(a)(1) and (2). Application Note 1 to USSG § 2E5.1 defines bribe as "the offer or acceptance of an unlawful payment with the specific understanding that it will corruptly affect an official action of the recipient;" Application Note 2 defines gratuity as "the offer or acceptance of an unlawful payment other than a bribe." Thus the Guidelines follow the distinction made in other statutes that a bribe involves a specific understanding that it will affect an official action—a quid pro quo.

The informations in the instant cases alleged that defendants were involved in a "gratuity," and did not refer to a "bribe." But they each included essentially the "with intent to be influenced with respect to" language of § 1954 that generally refers to a bribe. *See* 1 R. doc. 1 at WW 3, 6, 7 (No. 95-9066) (Kummer conspired to obtain money for stock "in exchange for" providing a loan for Jernigan's benefit, ¶ 3; he combined with others to offer value "to influence" the operations of an employee benefit plan, ¶ 6; he assisted others "to influence" Jernigan to use plan moneys to buy Tahoe stock, ¶ 7); 1 R. doc. 1 at WW 5, 6 (No. 95-9165) (Oglesby received from Tahoe moneys "because of and with intent to

be influenced with respect to his actions" concerning a welfare plan, ¶ 5;  he participated in negotiations to arrange a financial benefit to Jernigan "in exchange for" Jernigan's use of plan funds to buy Tahoe stock, ¶ 6);  1 R. doc. 1 at ¶ 5 (No. 95-9085) (Jernigan received moneys "because of and with intent to be influenced with respect to his actions" relating to a welfare plan, ¶ 5).

The plea agreements also used the language in a confusing manner, stating that "Count One alleges a violation of Title 18, United States Code, Section 1954, that is, to offer a *gratuity to influence* the operations of an employee benefit plan." (emphasis added). *See* 1 R. doc. 19 at ¶ 5a (No. 95-9066) (Kummer); *see also* 1 R. doc. 13 at ¶ 5a (No. 95-9085) (Jernigan) (same except "accept a gratuity to influence");  1 R. doc. 12 at ¶ 5a (No. 95-9165) (Oglesby) (same except "offer and accept a gratuity to influence"). The agreements also stated "defendant understands that Count One ... charges the defendant with offering something of value to influence the operations of an employee benefit plan."  1 R. doc. 19 at ¶ 6a (No. 95-9066) (Kummer); *see also* 1 R. doc. 13 at ¶ 6a (No. 95-9085) (Jernigan) (same except "obtaining a gratuity to influence");  1 R. doc. 12 at ¶ 6a (Oglesby) (same except "Offer, Acceptance, and Solicitation to Influence").  The government then agreed that the base offense level was based on USSG § 2E5.1(a)(2), gratuity, which would be six.

When defendants Kummer and Jernigan entered their guilty pleas, the district court told each defendant, as the plea agreement provided, that for sentencing purposes it was not binding

on the court and that if the court did not accept the recommendations in it they would not be able to withdraw. *See* 2 R. at 32-33 (No. 95-9066); 3 R. at 32-33 (No. 95-9085). The judge also stated, however, that if he did not accept the plea agreements he would give them a chance to withdraw. *Id.* at 43-44; 66 (both records).

Upon completion of the presentence reports (PSRs), the probation officer recommended that the judge find all of the defendants had been involved in a bribe, and thus apply the base offense level of ten. The PSRs differed in several respects from the plea agreements, including recommending a higher valuation. Defendants made numerous objections to the PSRs. The U.S. Attorney also filed objections, in particular stating that the transaction should not be classified as a bribe. The probation office then produced an addendum to the PSRs, in which it revised upward some of its recommendations. Defendants then filed further objections and the probation office made a final report.

After holding a hearing for defendants Kummer, Jernigan and Killian, during which both the probation officer and the labor department investigator testified, the district court accepted the PSRs' recommendations that the payments were bribes and thus the base offense level was ten. The district court did not allow defendants Kummer or Jernigan to withdraw their pleas.[2] Defendant Oglesby was sentenced later than the other defendants; the

---

[2]The district court did at one point ask defendant Jernigan's counsel if he wanted to withdraw the guilty plea. When Jernigan's counsel stated he would "have to think about that," the district court rescinded the offer. *See* 2 R. 23 (No. 95-9085).

district court gave him the opportunity to withdraw his plea but Oglesby declined. The district court adopted most of the other sentencing recommendations in each defendant's PSR and addendum. It sentenced Jernigan to twenty-four months; Kummer to eighteen months, and Oglesby to fourteen months.

## II

Defendants argue that they were charged with and pleaded guilty only to the gratuity prong of § 1954; that they must be sentenced for a gratuity; that the court should have applied the base offense level for gratuities in the Sentencing Guidelines. This argument is based on a reading of § 1954 as including two distinct offenses—bribe or gratuity—as opposed to one offense. We have found no Eleventh Circuit case, or any other circuit case specifically addressing whether § 1954 contains two separate offenses. *Cf. United States v. Gayle,* 967 F.2d 483, 485 n. 3 (11th Cir.1992) (en banc) (stating that 18 U.S.C. § 912, which provides "Whoever falsely assumes or pretends to be an officer or employee acting under the authority of the United States ... and acts as such, or in such pretended character demands or obtains any money" contains two distinct offenses), *cert. denied,* 507 U.S. 967, 113 S.Ct. 1402, 122 L.Ed.2d 775 (1993). But the case law we have found from other circuits suggests that § 1954 contains only one offense. *See, e.g., United States v. Rosenthal,* 9 F.3d 1016, 1017, 1020, 1024 (2d Cir.1993) (defendant was charged "with offering a gratuity in connection with a pension plan" and court referred to conviction for "intent to influence"); *see also United States v. Lopreato,* 83 F.3d 571, 574 (2d Cir.1996) ("While the difference between a bribe

and a gratuity does not affect the propriety of [defendant's] conviction under section 1954(1), a bribe commands a higher base level under the Sentencing Guidelines."). Further, neither the title of the statute, "Offer, acceptance, or solicitation to influence operations of employee benefit plan," nor its wording make a distinction between bribe and gratuity. We hold that the statute states a single crime, and it is only the Sentencing Guidelines that differentiate between levels of punishment applicable to that single offense. Thus, even though the informations in these cases used the term "gratuity," defendants pleaded guilty to violating the statute. The language of the informations alone did not foreclose the district court from assigning a base offense level for bribe.[3]

---

[3]Sentencing Guideline § 1B1.2 provides that the court "Determine the offense guideline section in Chapter Two (Offense Conduct) most applicable to the offense of conviction (*i.e.,* the offense conduct charged in the count of the indictment or information of which the defendant was convicted)." There is no question that the offense guideline section applicable here is § 2E5.1, "Offering, Accepting, or Soliciting a Bribe or Gratuity Affecting the Operation of an Employee Welfare or Pension Benefit Plan*;* Prohibited Payments or Lending of Money by Employee or Agent to Employees, Representatives, or Labor Organizations." That Guideline, however, contains two offense levels. The Guidelines provide that "[w]here there is more than one base offense level within a particular guideline, the determination of the applicable base offense level is treated in the same manner as a determination of a specific offense characteristic." USSG § 1B1.2, comment. (n. 2). Then USSG § 1B1.3(a) states,

> Unless otherwise specified, (I) the base offense level where the guideline specifies more than one base offense level, [and] (ii) specific offense characteristics, ... shall be determined on the basis of the following:
>
> 1(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

III

Defendants next assert that the *plea agreements* provided that they were involved in a "gratuity" but not a "bribe." As previously noted, Jernigan's plea agreement stated, "[t]he defendant understands that Count One alleges a violation of Title 18, United States Code, Section 1954, that is, to accept a *gratuity* to influence the operations of employee benefits plans." 1 R. doc. 13 at ¶ 5a (No. 95-9085) (emphasis added); *see also* 1 R. doc. 12 at ¶ 5a (No. 95-9165) (Oglesby) ("offer and accept a gratuity"); I R. doc. 19 at ¶ 5a (No. 95-9066) (Kummer) ("offer a gratuity"). Indeed, our review of the record suggests that both the government and defendants believed that the agreement was to plead to a violation of the statute through the gratuity prong.

Defendants Jernigan and Kummer argue that under Federal Rule of Criminal Procedure 11 the court was obligated to enter a sentence consistent with the plea agreement or to reject the plea agreement entirely and allow defendants to withdraw their guilty plea.

Rule 11(e)(1) provides:

> In General. The attorney for the government and the attorney for the defendant or the defendant when acting pro se may engage in discussions with a view toward reaching an agreement that, upon the entering of a plea of guilty or nolo contendere to a charged offense or to a lesser or related offense, the attorney for the government will do any of the following:

---

> (4) any other information specified in the applicable guideline.

> Thus, despite use of the term gratuity in the information, the determination of the base offense level under § 2E5.1 is to be made based on all of the information provided at sentencing.

(A) move for dismissal of other charges; or

(B) make a recommendation, or agree not to oppose the defendant's request, for a particular sentence, with the understanding that such recommendation or request shall not be binding upon the court;

(C) agree that a specific sentence is the appropriate disposition of the case.

The court shall not participate in any such discussion.

In *United States v. Dean,* 80 F.3d 1535 (11th Cir.1996), this court distinguished subsection (B) plea agreements from those under the other subsections.

> One important distinction between "B" pleas and "A" or "C" pleas is that only "B" pleas may be modified: "such a recommendation or request shall not be binding upon the court." This is made clear in Rule 11(e)(2), which states, in pertinent part:
>
> > If the agreement is of the type specified in subdivision (e)(1)(A) or (C), the court may accept or reject the agreement, or may defer its decision as to the acceptance or rejection until there has been an opportunity to consider the presentence report. If the agreement is of the type specified in subdivision (e)(1)(B), the court shall advise the defendant that if the court does not accept the recommendation or request the defendant nevertheless has no right to withdraw the plea.

*Id.* at 1539. As applicable here, if this is a "C" plea agreement the court must simply accept or reject the entire plea agreement; if it is a "B" agreement the court may accept the plea and reject the recommended punishment. *See id.* at 1541.

The plea agreements here contained the prosecution's promise to recommend a downward adjustment for acceptance of responsibility, and to consider asking for a USSG § 5K1.1 substantial assistance downward departure if it appeared justified. Those are clearly type "B" recommendations; defendants would not be able to withdraw their guilty pleas if the district court

decided not to follow them. *See Dean,* 80 F.3d at 1538-39. Defendants argue, however, that the government's agreement that each defendant was involved in a gratuity and that USSG § 2E5.1(a)(2) controlled the determination of the sentencing guideline range should be construed as a type "C" agreement. Thus, defendants contend that the instant agreements contained both type "B" agreements to recommend particular sentencing options as well as type "C" agreement that the offense fell under the gratuity base level offense of USSG § 2E5.1(a)(2).

This court has said that when the government "or the court" does not follow a plea agreement the court should order specific performance or afford the defendant an opportunity to withdraw the plea; and specific performance is preferred. *United States v. Jefferies,* 908 F.2d 1520, 1527 (11th Cir.1990) (plea stipulation specified drug quantity but court found quantity to be larger); *see also United States v. Taylor,* 77 F.3d 368, 371 (11th Cir.1996) (government paid "lip service" to plea agreement but then affirmatively supported position inconsistent with agreement; defendant allowed to withdraw plea); *United States v. Rewis,* 969 F.2d 985, 988-89 (11th Cir.1992) (when government breached plea agreement, remedies include specific enforcement or permitting withdrawal of plea).

Considering the ambiguous nature of the agreement, this is a close case. The agreements did not state that they were type "C" agreements or that they were type "B" agreements. They did not provide that defendants could withdraw if the court determined it could not apply the gratuity base offense level. The references to

"gratuity" might be viewed as factual stipulations, and as such they would not be binding on the court.  *See* USSG § 6B1.4(d).  For the reasons stated in the prior sections of this opinion the text of the agreement is not inconsistent with holding they are type "B" agreements, from which defendants would not be entitled to withdraw when the court decided not to follow the sentencing recommendations.  But we must also consider the advisement of the court when it accepted the pleas of Kummer and Jernigan.  Although the district court told defendants they would be unable to withdraw because the agreement was not binding on the court, it also twice informed them that they would be able to withdraw their plea if the court did not accept the agreement.[4]

Considering all the circumstances, including the sentencing court's statements to the defendants, if the court could not in good conscience accept the violations as justifying a sentence under the gratuity guideline, the sentencing court was obligated to

_____

[4]At the plea hearing, the district court stated that the "[p]lea agreement is not binding upon the Court.  The Court, of course, will have the presentence at some time, and if the Court should reject the plea agreement, of course, you may withdraw and enter a plea of not guilty and proceed to trial."  2 R. at 32 (No. 95-9066);  3 R. at 32 (No. 95-9085).  The court also stated that "[y]our lawyers and the government, no doubt, will make a recommendation to me as to what sentence should be imposed, as well as the probation officers.  I am not bound by those recommendations;  they are only that.  You cannot withdraw your plea of guilty even though I do not accept the recommendation." *Id.* at 33.  The government then recited the terms of the plea agreements, referring to gratuity.  *See id.* at 36-38, 41-42.  The district court then stated "the agreement is not binding upon the Court, but if the Court should reject it, or any of them, you will be given an opportunity to withdraw your plea of guilty and enter a plea of not guilty." *Id.* at 43-44.  Finally, at the end of the hearing the judge stated that he accepted the guilty plea, but that after the PSRs were prepared, "if I find that I cannot accept the plea, at that point I will reject it and allow everybody to enter a plea of not guilty." *Id.* at 66.

allow withdrawal of the guilty pleas. *See United States v. Forbes,* 888 F.2d 752, 753-54 (11th Cir.1989) (when court found reduction for minor role, as agreed upon by defendant and government, not justified by PSR, court offered to allow defendant to withdraw guilty plea). Because defendants Kummer and Jernigan were not afforded the opportunity to withdraw their pleas, we remand to the district court with the direction that it permit them to withdraw their guilty pleas.

The court did offer defendant Oglesby the opportunity to withdraw his plea and he declined. He does not argue that the government breached the plea agreement. Thus, defendant Oglesby's right to any relief is dependent upon the merits of the claims he raises that we discuss hereafter.

IV

Each defendant asserts that the district court erred in its *factual determination* that the base offense level for the offense of conviction was ten (bribe) rather than six (gratuity). *See* USSG § 2E5.1(a)(1) and (2). As previously noted, the base offense level for a bribe applies if there was an offer or acceptance of unlawful payment "with the specific understanding that it will corruptly affect an official action of the recipient," USSG § 2E5.1 comment. (n. 1); a gratuity is "the offer or acceptance of an unlawful payment other than a bribe," *id.* comment. (n. 2). We review the district court's findings of fact on this issue for clear error and review de novo the application of the Guidelines to the facts. *See United States v. Jennings,* 991 F.2d 725, 732 (11th Cir.1993).

Defendants argue that there was no evidence of a specific

understanding or a quid pro quo. They point to testimony by Sandra Rackleff, the labor department agent who investigated the case over a five year period, that she did not think there was enough evidence of a quid pro quo on which to base a bribe offense level. The United States probation officer, in contrast, testified that her recommendation to the contrary was based on a belief that the evidence supported an understanding between Jernigan and the Tahoe Company which prompted him to invest the health and welfare plan money in Tahoe stock. She recited evidence that Oglesby spoke to Jernigan several times to encourage Jernigan to invest in Tahoe, the turndown of Jernigan's first application for a loan, the timing of the defendants' discussions, the investment purchase, the loan made to Jernigan's girlfriend, and Oglesby's grand jury testimony. The probation officer highlighted Jernigan's grand jury testimony[5] that he was pushed into purchasing Tahoe shares by phone calls and contacts in part from Oglesby and also from Killian. She also pointed to Oglesby's grand jury testimony that "[the home loan] was a commitment that [Ed Killian] had made to Robert Jernigan in order

_____

[5]Defendant Jernigan raises the issue whether the probation officer improperly relied on information gained from his grand jury testimony in determining his guideline range. That would violate USSG § 1B1.8, which prohibits use of self-incriminating information provided pursuant to a cooperation agreement from being used in determining the applicable guideline range, except to the extent provided in the agreement. The PSR, its addendum, and the probation officer's testimony indicate that she relied on Jernigan's and Ogelsby's grand jury testimony in making the bribery recommendation. But the court reminded the officer that such self-incriminating testimony could not be used against a cooperating defendant. The court then elicited from the officer that she would have arrived at the same conclusion without considering the grand jury testimony. More importantly, as noted by the quotation in the text, the district court disclaimed any such reliance in making its own conclusion.

for Robert Jernigan to make the investment."  2 R. 68 (No. 95-9085).

In sentencing Jernigan the district court alluded to its own prior comments, as the testimony and arguments were made to it. The judge stated, "I think I made it known of my beliefs of why I found the bribe instead of the gratuity.  According to the law and to case law it is not a matter of semantics.  In no way can [Jernigan's] testimony before the grand jury be used against him. But the clear wording of the excerpts of the other defendants, the coincidences or lack of coincidences and all indicated but one conclusion to this Court."  *Id.* at 87.  The court's comments in sentencing Kummer, 3 R. at 49, 56 (No. 95-9066), and Ogelsby, 2 R. at 83-84 (No. 95-9165), are not as extensive but are to the same effect.

Of course, the standard for a sentencing court on a disputed fact involved in sentencing is a preponderance of the evidence. *United States v. Ignancio Munio,* 909 F.2d 436, 439 (11th Cir.1990), *cert. denied,* 499 U.S. 938, 111 S.Ct. 1393, 113 L.Ed.2d 449 (1991). "In resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."  USSG § 6A1.3(a).  The court's finding is not clearly erroneous.  There was sufficient evidence on which the court could find that the loan was a bribe under USSG § 2E5.1(a)(1), and thus a base offense level of ten was appropriate.

V

Defendants argue that the district court erred in determining the increase in their offense levels under USSG § 2E5.1(b)(2). We review the district court's determinations on this issue for clear error. *See United States v. Hang,* 75 F.3d 1275, 1284 (8th Cir.1996).

The Guidelines direct the court to increase the offense level "by the number of levels from the table in § 2F1.1 (Fraud and Deceit) corresponding to the value of the prohibited payment or the value of the improper benefit to the payer, whichever is greater." USSG § 2E5.1(b)(2). The district court adopted the PSRs recommendation that the offense characteristics be increased based on the "value of the improper benefit to the payer," which it stated was the full amount of Jernigan's $253,041 purchase of Tahoe securities.[6] All defendants argue the value of the improper benefit to Tahoe executives was not the full amount of the stock purchase.

Defendants contend that the "value of the prohibited payment"—the loan to Jernigan—should be used as the basis for increasing the offense level.[7] They then argue that the value of the loan for Jernigan's benefit was less than the $85,000 loan amount. Oglesby argues further that his plea agreement stipulated

---

[6]An additional $78,000 investment by a union official, Morton, steered to Tahoe by Jernigan, was added to the improper benefit total in the PSR addendum. We do not address that addition because it makes no difference to our analysis.

[7]The plea agreement with Jernigan stated that he agreed the amount of the gratuity was "approximately $91,000," apparently consisting of the $85,000 loan plus the $6,000 check Jernigan received and kept. 1 R. doc. 13 ¶ 5a. (No. 95-9085).

the prohibited payment was a gratuity of less than $40,000.

If the increase in offense level is to be based on the "value of the improper benefit to payer," that term is defined in the "Commentary to § 2C1.1." USSG § 2E5.1 comment. (n. 4). Application Note 2 to § 2C1.1 provides that " "the benefit received or to be received' means the net value of such benefit." It then provides as an example that if a $150,000 contract is awarded in return for a bribe, and $20,000 profit was made on the contract, the "value of the benefit received is $20,000." *Id.*

The basis of defendants' argument that the district court erred in using the entire amount of the $253,000 purchase of Tahoe stock is that the stock had some value. *See United States v. Fitzhugh,* 78 F.3d 1326, 1331 (8th Cir.1996) ("value of transaction is often quite different than the face amount of the transaction"). Although the district court adopted the PSR recommendation on this issue, the factual findings underlying its determination are not clear. The district court may have concluded the stock had no value, and therefore the entire amount of the purchase was the net value of benefit received by Tahoe. *Cf. Lopreato,* 83 F.3d at 576 (district court could have properly concluded securities had no value where evidence showed active looting of company and impaired collateral).

This issue may become relevant again on the remand we order. If it does the district court should make explicit factual findings as to value of the improper benefit. The court must determine the net benefit of the $253,000 stock purchase to Tahoe. If that figure is less than the $85,000 loan to Jernigan, as enhanced by

the $6,000 check payment Jernigan retained, the court will need to determine the value of the loan to see if it is greater than the net value of the Tahoe investment. The value of a loan to the borrower may also be less than the face amount. *See Fitzhugh*, 78 F.3d at 1331 (remanding and noting that "scanty evidence" suggests value of loan was less than face amount). If the borrower's promise to repay were worthless or unenforceable, the value of the loan might be the face value. *Id.* at 1331 n. 2. Further, "[w]hen a loan is obtained by bribes, it is likely to be at favorable terms, in which case its value will typically be the difference between the actual cost of the loan and the cost of the same loan at fair market terms and conditions." *Id.* at 1331. We leave the valuation questions to the district court on remand.

VI

Defendants Ogelsby and Jernigan assert that the district court erred in assessing them a two-level increase for abuse of position of trust. USSG § 3B1.3 provides for a two level increase in the base offense level "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." They first attack the legal basis for the two-level increase, asserting it amounts to double counting under Section 3B1.3, which also provides that "[t]his adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic." We review the district court's factual determination on this issue for clear error, but the question whether these facts justify the abuse of

trust enhancement is a question of law that we review de novo. *United States v. Terry,* 60 F.3d 1541, 1545 (11th Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 737, 133 L.Ed.2d 687 (1996). These defendants point to the commentary to other Guidelines relating to public corruption cases, USSG §§ 2C1.1 and 2C1.2 (bribes and gratuities), which state that generally § 3B1.3 should not be applied in these cases because the Guidelines took into consideration the fact that such cases necessarily involve abuse of positions of trust.[8] *See* USSG §§ 2C1.1, comment. (n. 3) (bribery); 2C1.2, comment. (n. 2) (gratuity).

We reject this argument. First, any private citizen could offer a bribe or gratuity to influence the operation of an employee benefit plan in violation of § 1954; they need not be in any position of trust. Thus, the § 2E5.1 base offense level does not include an abuse of trust. In *United States v. Pedersen,* 3 F.3d 1468, 1470, 1470 n. 6 (11th Cir.1993), we allowed enhancement for abuse of "special trust" under § 3B1.3 in an insider trading case even though an element of trust is implicit in laws prohibiting insider trading. We noted that the "Sentencing Commission has

---

[8]These defendants also note that the base offense level for a gratuity to a public official is a level seven, USSG § 2C1.2, while the base offense level for a gratuity under § 2E5.1(a)(2) is six; they assert this one-level difference demonstrates that the Commission views public corruption offenses under § 2C1.2 as more serious. Defendants argue "there is no rational basis for permitting an increase of two levels pursuant to U.S.S.G. § 3B1.3 for a bribery or gratuity offense under U.S.S.G. § 2E5.1 involving union officials, where the Guidelines relating to the more serious offense of public corruption covered by § 2C1.2 do not permit such an increase because they recognize that the abuse of trust factor was already taken into consideration in the formulation of those Guidelines." Brief of Appellant Oglesby at 26.

expressly excepted certain offenders from particular enhancements where it intended to do so."  Second, this conclusion seems compelled by Guideline section 2E5.1:  "If the adjustment for a fiduciary at § 2E5.1(b)(1) applies, do not apply the adjustment at § 3B1.3 (Abuse of Trust or Use of Special Skill)."  USSG § 2E5.1, comment. (n. 5).

Oglesby also attacks the factual finding that he was in a position of trust, noting that he was not a "fiduciary of the benefit plan or labor organization" as specified in § 2E5.1(b)(1). But the abuse of trust enhancement only requires a finding that defendant possessed a position "characterized by professional or managerial discretion" which "contributed in some significant way to facilitating the commission ... of the offense."  USSG § 3B1.3, comment. (n. 1).  In his position as a union official Oglesby had such discretion, and as the labor investigator pointed out, his position significantly contributed to facilitating the commission of the offense in this case.  The district court did not abuse its discretion in giving defendant Oglesby the two-level increase under § 3B1.3.

                              VII

Defendant Oglesby's argument that he should have received a two-level downward adjustment under USSG § 3B1.2(b) for being "a minor participant" does not impress us.  Pointing to Special Agent Rackleff's testimony at sentencing that he did not have control or authority over the money or transactions, he contends he was less culpable than the other defendants.  But Rackleff also testified that Oglesby was the facilitator of the transaction;  and the

record shows he played a significant role in assuring the illegal transactions were completed. He also profited, at least indirectly, from them. The district court did not err in denying a downward adjustment.

## VIII

Defendants Kummer and Jernigan make certain other contentions that we treat briefly because of the possibility these defendants will not withdraw their guilty pleas, or the issues will arise again after their trial.

Defendant Kummer argues that the district court erred in not departing below the Guideline range based on the government's USSG § 5K1.1 motion to depart because of his substantial assistance. We cannot review a court's refusal to grant a downward departure unless the district court erred in concluding it did not have authority to depart. *United States v. Fossett,* 881 F.2d 976, 979-80 (11th Cir.1989). At the sentencing hearing the court resolved the defendant's objections to the PSR, and found a total offense level of 15 and criminal history of I, indicating a sentencing range of eighteen to twenty-four months. After hearing testimony of defendant Kummer's assistance to the government, the court stated that it had read "the 5K1.1 motion filed by the government which the Court grants." 3 R. at 56 (No. 95-9066). The court, however, then sentenced defendant Kummer to eighteen months, which would *not* be a downward departure. On remand the district court should clarify this point if Kummer does not withdraw his guilty plea.

As to defendant Jernigan's argument that he should have

received a departure outside the Guidelines range because his behavior was aberrational and not within the heartland of cases controlled by the Guidelines, we note that the government recommended and the district court granted Jernigan a downward departure to twenty-four months for cooperation. The court clearly acknowledged that it could depart further downward but chose not to do so. Defendant Jernigan also argues that he was entitled to a downward adjustment under USSG § 3B1.2 as a minor or minimal participant. He asserts he was unsophisticated in business affairs, and attempts to frame the "offense" as Tahoe's overall investment scheme. But the offense of conviction involved here is the giving of a loan in exchange for or as a result of Jernigan's $253,000 investment in Tahoe. We fail to see how defendant Jernigan can argue he had a minor or minimal role in the offense of conviction. There was no abuse of the court's discretion. The other issues he raised are meritless and deserve no discussion.

Defendants Jernigan and Kummer request that a new judge be assigned to conduct proceedings on remand. After reading the record we are satisfied the district judge who conducted these proceedings did nothing to justify reassignment. Therefore, we decline the request.

AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.

.    .    .    .    .