**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Thomas R. MULLENS, Defendant–
Appellant.**

No. 93–4855.

United States Court of Appeals,
Eleventh Circuit.

Oct. 10, 1995.

**1562**

Richard C. Klugh, Asst. Federal Public Defender, James R. Gailey, Federal Public Defender, Miami, FL, for appellant.

Roberto Martinez, U.S. Atty., Miami, FL, Anthony P. Gonzalez, Linda Collins Hertz, Anne Ruth Schultz and Marc Fagelson, Asst. U.S. Attys., West Palm Beach, FL, for appellee.

Before EDMONDSON and BARKETT, Circuit Judges, and DYER, Senior Circuit Judge.

DYER, Senior Circuit Judge:

Appellant Thomas Mullens challenges his sentence after pleading guilty to charges of wire fraud under 18 U.S.C. § 1343, mail fraud under 18 U.S.C. § 1341, money laundering under 18 U.S.C. §§ 1956 and 1957, and *nolo contendere* to conspiracy in violation of 18 U.S.C. § 371. The district court sentenced Mullens to imprisonment for a total term of 405 months, ordered restitution, and denied a reduction for acceptance of responsibility. On appeal Mullens contends the court erred in (1) grouping the money laundering counts with the fraud counts pursuant

to U.S.S.G. § 3D1.2(d); (2) increasing the money laundering offense by ten levels; (3) denying acceptance of responsibility; (4) assigning a criminal history category of IV; (5) awarding restitution of over $27 million; and (6) adding two levels for abuse of a position of private trust pursuant to U.S.S.G. § 3B1.3. We affirm on all issues except restitution and the enhancement for abuse of trust.

### I. Background [1]

In April 1989 Mullens formed and began operating Omni Capital Group in Boca Raton, Florida. Mullens was the president and sole shareholder. He employed commissioned salespeople, secretaries, and receptionists for the corporate office in Boca Raton and sales offices in New Jersey, California, and Ohio. Omni purportedly sold investment opportunities in the form of shares, contract rights, and participation rights in limited partnerships. Mullens told investors the limited partnerships were formed to purchase and sell small, privately held companies for a profit. In reality, Omni was a ponzi scheme.

Mullens, assisted by some of his employees, caused 150 victims to invest $27,032,811 in the ponzi by means of false pretenses and promises. Mullens told the probation department during a presentence interview that he founded Omni intending to operate a legitimate business, but the department later learned Mullens admitted his true intent during the course of Omni's bankruptcy proceedings. Notably, Omni had no assets other than the money invested by the victims; it generated no business profits except for some minimal rental revenue.

The demise came in April 1992 when an investigation by the Securities and Exchange Commission prompted investors to liquidate their holdings. Omni eventually filed bankruptcy. All but approximately $7.4 million of the funds invested were traced through reconstruction of Omni's books and bank records.[2] To expand the scheme and keep in-

---

1. The district court adopted the factual findings presented in the presentence investigation report ("PSI"). We summarize the pertinent facts from the PSI and the parties' briefs.

2. The probation department believed Mullens may have concealed this money in a foreign bank account. At the sentencing hearing the accountant for the bankruptcy trustee, Jack Goldstrich,

vestors involved in the limited partnerships as long as possible, Mullens spent some of the money on false account statements reflecting annual rates of return of twenty to thirty percent. As with the typical ponzi scheme, he used some of the contributions from later investors to pay off returns promised to earlier investors, thus perpetuating the scheme by leading investors to believe Omni was a successful, profitable enterprise. Mullens spent some of the fraudulently acquired money on symbols of success, such as an airplane, fictional glossy brochures, staffed offices, and a country club membership.

A federal grand jury returned an indictment charging Mullens with eight counts of wire fraud in violation of 18 U.S.C. § 1343, and twenty counts of mail fraud in violation of 18 U.S.C. § 1341. A superseding indictment was returned recharging the original counts, and adding twelve counts of money laundering by participating in financial transactions with proceeds from and to promote a fraudulent scheme, in violation of 18 U.S.C. § 1956(a)(1)(A)(i); seven counts of money laundering by participating in financial transactions in criminally derived property, in violation of U.S.C. § 1957; and one count of conspiracy in violation of 18 U.S.C. § 371.

Mullens pled guilty to all counts except conspiracy, as to which he pled *nolo contendere*. Adopting the factual findings and applying the guidelines as recommended in the PSI, the district court imposed a sentence of 405 months imprisonment in accordance with an offense level of thirty nine and a criminal history category of IV.[3] The sentencing range was 360 months to life. The PSI grouped all counts of conviction pursuant to U.S.S.G. § 3D1.2(d) and took the highest offense, money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), to compute the base offense level of twenty three under

U.S.S.G. § 2S1.1(a). The court added ten levels upon finding that the value of the investments fraudulently obtained was at least $20 million. The base offense was further enhanced by four levels pursuant to § 3B1.1(a) for Mullens' role as founder and president of Omni, and by two additional levels pursuant to § 3B1.3 for abuse of a position of private trust. The court denied a decrease for acceptance of responsibility because Mullens failed to assist the government in recovering the $7.4 million and failed to admit that Omni was a fraudulent business from inception. The court also ordered restitution of the $27 million. On appeal Mullens challenges the correctness of his sentence.

## II. Calculation of the Base Offense Level and the Value of Laundered Funds

The legal questions presented by Appellant's argument are a matter of first impression in this Circuit. Mullens contends the district court misapplied U.S.S.G. § 3D1.2(d) by grouping the fraud and money laundering counts to calculate the base offense level. He also contends the district court erred in determining the value of funds laundered by (1) using the measure of harm for fraud, rather than the amounts charged in the indictment for money laundering, to enhance the base offense by 10 levels; and (2) failing to deduct from the fraud receipts the money returned to investors. We disagree.

■ The district court's factual findings are accepted, including the amount involved in a money laundering offense, unless clearly erroneous. *United States v. Yount,* 960 F.2d 955, 956 (11th Cir.1992); and *United States v. Barrios,* 993 F.2d 1522, 1524 (11th Cir. 1993). A factual finding is not clearly erroneous unless the court "is left with the definite and firm conviction that a mistake has been committed." *United States v.*

---

testified to tracing $6 million of Omni's money into Mullens' personal account, but could not account for the $7.4 million. He concluded the funds did not vanish and were accessible by Mullens. Mullens testified he knew of no assets that remained unaccounted for and that he had no money.

**3.** The PSI concluded seven criminal history points were warranted based on three previous

felony convictions including (1) a conviction in federal court for mail fraud in connection with devising and operating a real estate scam; (2) a conviction in state court for writing worthless checks through the fraudulent real estate development company; and (3) a conviction in federal court for conspiracy to defraud the U.S. Customs Service.

*Edmondson,* 791 F.2d 1512, 1514–15 (11th Cir.1986). We review application of the guidelines to the facts *de novo. Yount,* 960 F.2d at 956.

■ Section 3D1.2(d) provides that counts involving substantially the same harm shall be grouped "when the offense level is determined largely on the basis of the total amount of harm or loss ... or some other measure of aggregate harm...." The main purpose of U.S.S.G. § 3D1.2 is "to combine offenses involving *closely related* counts." *United States v. Harper,* 972 F.2d 321, 322 (11th Cir.1992) (emphasis in original). The relevant guideline provision for the money laundering offense is § 2S1.1; the relevant fraud provision is § 2F1.1. Both of these offenses may be grouped under § 3D1.2(d), although grouping under that subsection is not automatic. *Id.* "Counts involving offenses to which different offense guidelines apply are grouped together under subsection (d) if the offenses are of the same general type and otherwise meet the criteria for grouping under this subsection." U.S.S.G. § 3D1.2, comment. (n. 6); *Harper,* 972 F.2d at 322.

■ The money laundering and fraud convictions in this ponzi scheme are closely related. They are the same general type of offense because both the fraud and the money laundering were integral cogs in continuing the scheme. Without the fraud there would have been no funds to launder. Laundering money by returning false profits to some investors and paying expenses to maintain a facade of success enabled Mullens to attract new investors and keep old investors from discovering his deceit. These convictions were properly grouped under § 3D1.2(d). *But see United States v. Johnson,* 971 F.2d 562, 575–76 (10th Cir.1992).

■ The value of funds involved in a money laundering offense is a specific offense characteristic. U.S.S.G. § 2S1.1(b). Specific offense characteristics are determined by relevant conduct, defined as "all acts and omissions committed ... induced, procured or willfully caused by the defendant ... that occurred during the commission of the offense of conviction, in preparation for ... or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1). Provided an offense can be grouped under U.S.S.G. § 3D1.2(d), all acts and omissions that were part of the same common scheme or plan as the offense of conviction are considered in sentencing; a conviction is not required to be factored into the determination. U.S.S.G. § 1B1.3, comment. (n. 3); *Barrios,* 993 F.2d at 1522. A sentencing court is "required to consider the total amount of funds that it believed was involved in the course of criminal conduct." *Id.* at 1524. *See also* U.S.S.G. § 3D1.3(b) (the offense level for a group corresponds to the aggregate quantity involved); *United States v. Tansley,* 986 F.2d 880, 884 (5th Cir.1993) (holding that the amount intended to be laundered is the determining factor under § 2S1.1(b), not the amount actually laundered); *United States v. Fuller,* 974 F.2d 1474, 1484 (5th Cir.1992) (no clear error committed by setting offense level under § 2S1.1 with reference to the "amount of money that the defendants were 'reasonably capable' of laundering"), *cert. denied,* —— U.S. ——, 114 S.Ct. 112, 126 L.Ed.2d 78 (1993); and *Johnson,* 971 F.2d at 576, n. 10 ("[F]unds associated with uncharged instances of money laundering can be added in to determine the offense level if within the scope of relevant conduct.").

■ Mullens' plan was to solicit money from investors, and perpetuate the scheme and avoid detection by using the money to pay business expenses, attract other investors, and pay off earlier investors. The district court found that the value of funds laundered was at least $20 million. Mullens collected over $27 million from investors [4] and deposited that amount into Omni's accounts. Once deposited the funds met the definition of "laundered funds" under 18 U.S.C. § 1956(a)(1)(A)(i) because they had no purpose other than to promote the illegal

---

4. The trustee's accountant testified at the sentencing hearing that $27 million was too conservative. He believed an additional $2.6 million should be added for funds transferred from Omni's predecessor, United Services Association. Notwithstanding the unaccounted for $7.4 million, the court could therefore have found the laundered funds exceeded $20 million.

business of the ponzi. Thus, the amount of money collected through fraud was co-extensive with the sums involved in the charged and uncharged money laundering counts and was, therefore, the total amount of funds involved in the ponzi. *Barrios,* 993 F.2d at 1524; and *United States v. Rose,* 20 F.3d 367, 371–72 (9th Cir.1994). *See also Johnson,* 971 F.2d at 570 (payment of false profits in a fraudulent scheme is money laundering). We therefore affirm the ten level enhancement for laundering in excess of $20 million.

### III. Acceptance of Responsibility

The sentencing guidelines permit a two level reduction if the defendant has clearly accepted responsibility for his crime. U.S.S.G. § 3E1.1(a). The district court denied the reduction in this case, which "is entitled to great deference and will not be disturbed unless clearly erroneous." *United States v. Thompson,* 976 F.2d 666, 673 (11th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3010, 125 L.Ed.2d 701 (1993). *See also United States v. Pritchett,* 908 F.2d 816, 824 (11th Cir.1990) ("Unless the court's determination is without foundation, it should not be overturned on appeal.").

■ The court heard the accountant's testimony at sentencing regarding the missing funds. According to the PSI, Mullens offered no explanation for or assistance in recovering the $7.4 million. Furthermore, even though Mullens pled guilty and cooperated with the government on many matters, he told the probation officer that Omni did not begin as a fraudulent business and later testified in bankruptcy court to his real intent. In addition, Mullens testified at the sentencing hearing that he never intended to hurt anyone, which the court weighed against substantial evidence to the contrary. Based on this evidence, there was no error in holding that Mullens had not clearly recognized and affirmatively accepted responsibility for his criminal conduct. *See* U.S.S.G. § 3E1.1, comment. (n. 1); and *United States v. Paslay,* 971 F.2d 667, 675 (11th Cir.1992). *See also United States v. Mendoza–Cecelia,* 963 F.2d 1467, 1479 n. 10 (11th Cir.) ("admission of guilt does not necessarily warrant a reduction for acceptance of responsibility"), *cert.*

*denied,* —— U.S. ——, 113 S.Ct. 436, 121 L.Ed.2d 356 (1992), *abrogated on other grounds, Coleman v. Singletary,* 30 F.3d 1420 (11th Cir.1994).

### IV. Criminal History

■ The district court computed a criminal history category of four based upon Appellant's three previous felony convictions. The court found the convictions were independent of each other and involved different victims. Mullens contends the federal court conviction for soliciting investors through his fraudulent real estate development company, and the state court conviction, involving insufficient checks issued by the company, are related within the meaning of the guidelines. The court's finding will remain undisturbed unless clearly erroneous. *United States v. Jones,* 899 F.2d 1097, 1101 (11th Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 275, 112 L.Ed.2d 230 (1990), *overruled on other grounds, United States v. Morrill,* 984 F.2d 1136 (11th Cir.1993).

■ In assigning points for criminal history, convictions are related if they (1) occurred on the same occasion, (2) were part of a common scheme or plan, or (3) were consolidated for trial or sentencing. U.S.S.G. § 4A1.2, comment. n. 3; *Jones,* 899 F.2d at 1101. Convictions are part of a common scheme if "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purposes, or similar *modus operandi.*" U.S.S.G. § 1B1.3, comment. (n. 9). Mullens argues the "fund insufficiency" was integral to the real estate fraud and thus part of a common scheme. He testified, in essence, that the checks would have been honored except for an intervening federal investigation of the scam, which interrupted the flow of funds into the company's accounts.

■ Mullens does not allege there were victims or accomplices common to the fraud and bad check convictions. There was no evidence of a common purpose or similar *modus operandi.* Unlike the interdependence of the fraud and money laundering in this case, bouncing checks did nothing to facilitate the real estate scam. The worth-

less checks were false representations that the company had sufficient funds to cover the face value of the checks. The misrepresentations Mullens used to defraud the real estate investors were separate and distinct from the misrepresentations made by presenting bad checks. In addition, the record before the district court showed that the conduct supporting the federal conviction antedated the conduct supporting the state conviction by at least six months.

We find no error in the district court's decision that the two convictions were unrelated.

## V. Restitution

■ The PSI reflects that Mullens collected over $27 million from investors in the ponzi scheme, but that approximately $19 million was due to investors at the time of sentencing. The probation department did not clearly explain how it calculated the $19 million, although there is some indication in the record that the difference is due to Mullens repaying some investors who became wise to his scam. The water is further muddied by the possibility that some of those investors received preferential payments which must be returned to the bankruptcy trustee. The defendant argues that the district court made an $8 million error in awarding restitution, presumably based on the difference in the amount initially collected and the amount due to investors as of the date of sentencing. The record is unclear, however, on how or why the court calculated a $27 million award over Mullens' objection. Furthermore, there is a dearth of evidence, if any, on his financial condition and ability to pay restitution as required by *United States v. Apex Roofing of Tallahassee, Inc.*, 49 F.3d 1509, 1514 (11th Cir.1995), and *United States v. Remillong*, 55 F.3d 572, 574–76 (11th Cir. 1995). For these reasons we reverse the award and remand to the district court for further proceedings consistent with this opinion.

## VI. Abuse of Trust Enhancement

The PSI recommended a two level enhancement for abuse of a position of private trust pursuant to U.S.S.G. § 3B1.3, predicated on Appellant's abuse of friendships with investors made through his membership in a country club. The probation office found Mullens developed social relationships and gained the trust of club members, which afforded him the opportunity to misrepresent himself and his business. The government relies on the PSI, and also argued that an addendum to the PSI justified the increase based on Mullens' position as head of and sole stockholder in Omni, and his representations of being a financial advisor that encouraged investors to put their life savings into Omni, coupled with the total control he had over all funds deposited in Omni's accounts. The latter argument applies to all investor relationships, not just those cultivated through the country club.

The guidelines do not define a "position of trust," but § 3B1.3 requires that the defendant occupy a "position" which "must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult)." U.S.S.G. § 3B1.3, comment. (n. 1).

■ We are not aware of any evidence suggesting that Mullens had a special, close, or personal attachment, or fiduciary relationship, with any member of the country club that significantly contributed to his ability to perpetrate or conceal the ponzi scheme. Country club membership is often used as an avenue to develop business contacts. Mullens was not in a "position of trust" simply by virtue of developing ordinary social relationships.

The government's second argument is unpersuasive and, if accepted, would result in double counting. Mullens may have touted himself as a "gifted investor who the Omni investors could trust" and an "investment and financial advisor," as the government argues. To our knowledge, however, there was no evidence Mullens held himself out as an investment broker, or advertised Omni as an investment brokerage firm. If he had run a legitimate but unprofitable enterprise, Mullens would have been considered nothing more than a business owner who offered investment opportunities to the public that

soured. We see nothing in these circumstances to support the conclusion that a position of private trust between Mullens and his victims was created. The cases cited by the government on this issue are unpersuasive as they all pertain to positions involving some degree of public trust. *See and cf. United States v. Milligan*, 958 F.2d 345, 346 (11th Cir.1992) (involving a post office clerk); *Yount*, 960 F.2d at 957 (involving a vice-president and trust officer of a bank); *United States v. Queen*, 4 F.3d 925, 926, 929 (10th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1230, 127 L.Ed.2d 575 (1994) (involving a defendant who misrepresented himself as an investment advisor/broker and provided victims objective indicia of such role); and *United States v. Tardiff*, 969 F.2d 1283, 1289–90 (1st Cir.1992) (involving an investment banker).

Often there is a component of misplaced trust inherent in the concept of fraud, such as in this case. One must hold a position of trust before it can be abused, however. Fraudulently inducing trust in an investor is not the same as abusing a bona fide relationship of trust with that investor. Furthermore, to say that Mullens' position in Omni, or his control over Omni's accounts, facilitated the offense is merely another way of saying he controlled an elaborate, well-organized ponzi scheme. Appellant's sentence has already been enhanced under U.S.S.G. § 3B1.1 for his role as the leader and organizer of extensive criminal activity. Additional enhancement for abuse of trust was improper.

## VII. Conclusion

The district court's computation of Appellant's sentence on all issues is affirmed, except for the restitution award and enhancement under U.S.S.G. § 3B1.3. We reverse and remand for further proceedings on the issue of restitution and for resentencing without enhancement for abuse of a position of private trust.

AFFIRMED in part; REVERSED and REMANDED in part.