HULL, Circuit Judge,
concurring in part and dissenting in part:
I concur in the majority opinion as to Rule 11 and Restitution, but disagree with its reversal of the two-level enhancement for abuse of a position of trust under U.S.S.G. § 3B1.3. In my view, Morris held a position of private trust in this broker-trader scheme and abused that position to facilitate both the commission and concealment of the offense.[1] Our precedent has not answered whether persons who are engaged in a brokerage-trading business and who utilize trust bank accounts as an integral part of that business occupy a position of private trust. I would hold they do.
I first review the undisputed facts which show that Morris and his co-conspirators not only purported to operate a brokerage-trading business, characterized by professional and managerial expertise and discretion, but also used various trust bank accounts for their clients’ funds in order to facilitate and conceal the scheme. The undisputed facts are in three places in the record: (a) the statement of facts filed with the plea agreement and then recited during the plea colloquy; (b) the pre-sen-tence report; and (c) admissions during the sentencing hearing. The facts filed with the plea agreement (and recited almost verbatim during the plea colloquy) are as follows:[2]
During the conspiracy charged in the indictment, [defendants] George Melvin Bevre, Calvin Fredrick Brown, Robert Charles Stewart, James C. Morris and Royce Edward Tolley conducted fraudulent investment programs to obtain money from unsuspecting investors by using the telephone, facsimiles, wire transfers of funds, and the United States Mail. The five defendants induced potential investors to invest in a variety of programs and made false and fraudulent representations by wire and mail to defraud investors throughout the United States and to launder money through a fund rotation scheme, and used bank accounts in Minnesota, Nevada, California, Colorado, Maryland, Alachua County, Florida, and in foreign countries to move and conceal the investors’ funds. They also engaged in a technique common in fraudulent schemes called “layer *1301 ing,” whereby individuals fraudulently obtain funds from investors and pass a portion on to other companies and individuals, who claim not to be “the person investing the funds,” and can then ostensibly cast blame on others to whom investors’ money was sent. In such frauds, layering and the “blame game” continue endlessly to stall, frustrate and eventually defeat investors who seek just compensation.
The scheme in this case consisted of fraudulent promises and representations by the defendants that investors would receive exorbitant returns on their investments in purported currency, banknote and bank debenture trading programs.
In truth, the “investment programs” either did not exist or were of such dubious existence that the defendants’ failure to perform due diligence and their promises of investment returns constituted, at a minimum, willful blindness. The defendants obtained investors’ funds by making false representations and using other persons to falsely represent to investors that the “programs” were legitimate high-yield opportunities in the world of international finance. Once the investors’ funds went into the defendants’ bank accounts, the defendants would use bank wire transfers to send funds to other persons and entities throughout the world to conceal the money trail and to promote the investment fraud.
From June 1996 through June 1997, ... Bevre made false representations to entice funds from persons to invest in fictitious currency and bank debenture trading programs, and caused those funds to be deposited into his Global Funding account at various financial institutions.
From late 1996 through April 1997, Brown and Stewart, -using the names TKG Maintenance and Ventura Enterprises, made false and misleading representations to obtain funds from investors through the United States mail and bank wire transfers.
Between May 9, 1997 and May 15, 1997, George Melvin Bevre wire transferred 1.5 million dollars from his Global Funding trust account at Calvert Shareholder Services, a division of the Calvert Group mutual fund management firm in Baltimore, Maryland. Bevre sent five hundred thousand dollars to Brown’s Roman Carlos Trust bank account at the Levy County State Bank in Chiefland, Florida, and one million dollars to Stewart’s Jonathan Mencken Trust bank account at the Barnett Bank in Gainesville, Florida.
Brown and Stewart each took approximately three hundred thousand dollars from those accounts and wire transferred to it to accounts they controlled in Antigua, British West Indies, from which they wire transferred funds back into the United States and used for their own benefit.
After receiving the $1.5 million from Bevre and skimming 600 thousand dollars from that and other investors’ funds in the Roman Carlos Trust and Jonathan Mencken Trust accounts, Brown and Stewart wired 1.2 million dollars to James C. Morris, a non-practicing attorney in Gardnerville, Nevada.
Morris portrayed himself as a “trader” who conducted successful multimillion dollar international bank trades in the past. Morris has been involved as an alleged “trader” with Stewart in February 1997, when Brown and Stewart each took $50,000 from a purported investment of four hundred thousand dollars wire transferred to them.
*1302 After receiving the funds from Brown and Stewart in. May 1997, Morris commingled them in three of his bank accounts with other moneys he had fraudulently obtained, and wire transferred hundreds of thousands of dollars to Royce E. Tolley, then an attorney in Castle Rock, Colorado.
Tolley has since been disbarred by the Colorado Bar for fraudulent activities with clients. Both Morris and Tolley used attorney-client trust accounts to receive and transfer funds obtained by fraudulent representations.
Tolley also received wire transfers from Morris in Tolley’s Echo Hills Swim and Tennis Club account.
When Brown’s investors pressured him about their investments during the summer of 1997, he advised them that their money had been sent to Morris and that Morris had transferred some of their money to Tolley. The investors then contacted and maintained contact with Morris, Tolley, and Brown.
Tolley contacted investors of Brown and Stewart and told them that he, Tol-ley, and James C. Morris were attempting to find and return the investors’ money. In November 1997, Tolley sent investors a nine-page document titled: “Assignment of Interest in Joint Venture Non-Circumvention and Fee Agreement.”
Paragraph 3.G of that document reads:
By its signature(s) hereto, Brown (all members of the Brown group) agrees to forego any and all legal, civil or criminal, that it or any person or entity has against James C. Morris, Royce E. Tolley, Allen Clark, Pacific Bank AIU, or any other person with regard to the 1.2 million dollars transferred by Brown’s group to Morris for investment purposes on the condition that Brown’s group receives the 1.2 million on or before December 15th, 1997, and the remaining 3.6 million on or before February 1,1998.
In a letter to Calvin Brown dated December 7, 1997, Tolley stated that he had “in place” financial transactions to-talling more than three billion dollars, and that “I have a lot on the table and I believe we will work our way through these very soon.”
Tolley’s November agreement and his December letter were simply stalling tactics to keep Brown’s investors from going to law enforcement authorities because neither he, Morris, Brown nor Stewart had the means or intention to pay any investor.
From November 1997 through February 1998, an investor who gave Brown twenty-five thousand dollars in April 1997, received numerous telephone calls from Brown, Morris and Tolley in which they continually stated: “The money is on the way,” and that it would be deposited into Stewart’s offshore accounts for payment of principal and interest to the investors.
Morris also told the investor that he had cancer and was on dialysis. This investor and numerous other investors never received an interest payment or return of their principal.
Morris was interviewed by the FBI and admitted that Brown and Stewart had wire transferred 1.2 million dollars to him, but gave an excuse that the investment that he had planned was not workable. He also said Brown and Stewart had given him authorization to invest the money in whatever venture Morris felt would return a high yield. Morris said the money was to go towards the purchase or lease of 25 million dollars in Treasury bonds.
Tolley was also interviewed and stated that he had dealt with Morris in investment ventures in 1997. He said Brown *1303 called him in October or November 1997 about the 1.2 million dollars given to Morris. Tolley admitted Morris gave him at least six hundred thousand dollars of that money in June 1997. He also admitted that he talked to two of Brown’s investors and prepared an agreement in which he agreed to pay the two investors twenty-five thousand dollars each.
The loss to investors during the charged mail fraud, wire fraud, and money laundering conspiracies was approximately 1.6 million dollars. The individual defendants received from approximately two hundred thousand dollars to six hundred thousand dollars from their fraudulent activities; the precise figure for each defendant will be determined prior to sentencing.
(Plea T. pp. 15-21).
The pre-sentence report also outlined the offense conduct in similar detail. These undisputed facts are taken from that report:[3]
31. James C. Morris is an attorney licensed by the State Bar of California, whose residence was in Gardnerville, Nevada. During the instant offense, Morris was falsely portrayed to investors, by co-conspirators Calvin F. Brown and Robert Charles Stewart, as a sophisticated “trader” of currency and bank instruments in the international financial community. When Morris received wire transferred funds from Brown and Stewart, he would commingle those funds with other funds in his bank account and would immediately transfer various amounts of those funds to other bank accounts in his name and in the names of other persons and alleged business entities, thus rotating the funds to conceal them and prevent the funds from being traced. Morris would then transfer the remaining funds to co-conspirator Royce Edward Tolley, an attorney in Castle Rock, Colorado. Tolley would continue the rotation of the funds, while retaining a portion of the funds for his personal use.
36. Bevre, also known as George Hart, was the owner and controller of Global Funding Limited Trust. This trust was created on or about June 13, 1996, and had bank accounts at the First American Bank of Breckenridge, in Breckenridge, Minnesota and at Calvert Shareholder Services, in Baltimore, Maryland. These accounts were used by Bevre/Hart to deposit and withdraw funds obtained from the fraudulent scheme.
38. Brown was a resident of Levy County, Florida and was a signatory and controller of the Roman Carlos Trust and Barco Resources Limited accounts. The Roman Carlos Trust account was obtained through the Passport Society, which provided for the creation of a “colato”, allegedly under the law of Antigua, BWI. The Passport Society is an offshore investment company that sets up trust accounts, international corporations, etc.
*1304 39. Brown and co-conspirator Robert C. Stewart operated as promoters/brokers. They induced potential investors to invest in a variety of programs and made false and fraudulent representations to investors in order to facilitate the fraud scheme. The funds obtained by the fraud scheme were then laundered through a fund rotation or “shell game.”
41. Stewart was a resident of Gaines-ville, Florida, and a signatory and controller of the Jonathon Mencken Trust and Bittner Group, Limited. The Jonathon Mencken Trust was obtained through the Passport Society, which provided for the creation of a “colato”, allegedly under the laws of Antigua, BWI. Stewart and co-conspirator Calvin F. Brown operated as promoters/brokers. They induced potential investors to invest in a variety of programs and made false and fraudulent representations to investors in order to facilitate the fraud scheme.
43. Tolley was a practicing attorney who resided in Denver and Castle Rock, Colorado. Tolley received wire transfers from co-conspirator James C. Morris.
At the sentencing hearing, Morris’ counsel also acknowledged that “Mr. Morris was a licensed attorney. He had an attorney trust fund that was established. All of the money that was received by Mr. Morris mainly from co-defendants, not directly from quote victims, went into that account” and that “there was no other funds in that account.” (Sent. T. p. 12). Morris admitted to receiving $3.2 million in his attorney-client trust fund account.[4]
Considered together, these undisputed facts reveal that Morris and his co-conspirators operated as a brokerage-trading business that was characterized by professional and managerial expertise and discretion and that utilized various trust accounts to engender trust and to facilitate the scheme and delay discovery of the fraud. Stewart, Brown, and Bevre represented themselves as professional brokers. During his plea colloquy, Morris admitted that “Morris portrayed himself as a trader who conducted successful multimillion dollar international bank trades in the past.” Morris also did not object to the pre-sentence report’s statement acknowledging that his co-conspirators also portrayed him that way to the investors. Specifically, the pre-sentence report stated that “[djuring the instant offense, Morris was falsely portrayed to investors, by co-conspirators Calvin F. Brown and Robert Charles Stewart, as a sophisticated ‘trader’ of currency and bank instruments in the international financial community.”
Morris also admitted he and the co-conspirators utilized various trust bank accounts as part of the scheme and rotated the funds through many bank accounts, including those trust accounts. The investor clients wired their money usually to one of these three trust accounts: (a) Global Funding Trust; (b) Roman Carlos Trust; and (c) Jonathan Mencken Trust. Bevre’s Global Funding trust account was at Calvert Shareholder Services, a division *1305 of the Calvert Group mutual fund management firm in Baltimore, Maryland. From these trust accounts, at least $3.2 million in funds were wired to Morris’ attorney-client trust account. Some of the money was then wired by Morris to Tolley’s attorney-client trust account. These various trust accounts not only helped legitimize the transactions and engender the victims’ trust but also helped conceal, prevent, and delay the tracing of the funds and discovery of the fraud.
When the investor clients pressured Morris, the “investors then contacted and maintained contact with Morris, Tolley and Brown.” The blame game and stalling were also part of the overall brokerage-trading scheme to provide time to conceal the funds and defeat any recovery of the funds. When the investor clients pressured Tolley and Morris, Tolley (a practicing attorney) even drafted an agreement to convince them to forego legal action against him and Morris in return for fixed dates of repayment.
Based on these undisputed facts, I would affirm the two-level enhancement under U.S.S.G. § 3B1.3 for several reasons.[5] First, the fact that no legitimate brokerage-trading firm or business existed does not preclude the enhancement. Instead, we must consider the case as if this was a legitimate investment brokerage firm or business with professional brokers and traders, who traded currency and bank notes in the international financial markets and who were entrusted with the discretion to invest clients’ funds and used various trust accounts to foster that trust. Even though Morris may not have had a traditional attorney-client relationship, the fact that he and his co-conspirators used numerous trust accounts as part of the overall scheme may still be considered.[6]
Second, the position of trust issue has been decided and developed on a ease-by-case basis, and we have not answered the position of trust issue specifically as to investment brokerage business with professional brokers and traders using trust accounts.
Third, our precedent supports the enhancement where the defendant occupies a position characterized by professional and managerial discretion. For example, in United States v. Kummer, 89 F.3d 1536 (11th Cir.1996), we explained that “the abuse of trust enhancement only requires a finding that defendant possessed a position ‘characterized by professional or managerial discretion’ which ‘contributed in some significant way to facilitating the commission of the offense.’ ” Id. at 1547 (quoting U.S.S.G. § 3B1.3, comment, (n. *1306 1)). In Kummer, the defendant Oglesby “attack[ed] the factual finding that he was in a position of trust, noting that he was not a ‘fiduciary of the benefit plan or labor organization’ as specified in § 2E5.1(b)(l).” Id. In affirming the two-level increase under § SB1.S, we concluded that “[i]n his position as a union official” Oglesby had professional or managerial discretion, and that “his position significantly contributed to facilitating the commission óf the offense in this case.” Id.
In United States v. Ward, 222 F.3d 909 (11th Cir.2000), this Court also observed that “[t]he commentary to § 3B1.3 tells us that the phrase ‘[pjublic or private trust refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).’ ” Id. at 911 (citing U.S.S.G. § 3B1.3, comment, (n. 1)). In Ward, we further noted that the commentary also advises “that people in such positions ‘ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.’” Id. The defendant in Ward was an armored car guard who was convicted of stealing money from the armored cars he guarded during the pick-up and delivery of bank deposits. Id. at 910. We concluded the abuse of trust enhancement did not apply because the guard was given no discretion and his position was comparable to an ordinary bank teller or hotel clerk position. Id. at 912-13. In contrast, investment brokerage firms or businesses are entrusted with broad discretionary authority to manage the funds of their clients through the application of specialized, professional knowledge.
I recognize that in United States v. Mullens, 65 F.3d 1560 (11th Cir.1995), we concluded that the defendant Mullens was not in a position of trust by touting himself as a “ ‘gifted investor who the Omni investors could trust’ and an ‘investment and financial advisor.’ ” Id. at 1566-67. We noted that if he had run legitimate businesses, then “Mullens would have been considered nothing more than a business owner who offered investment opportunities to the public that soured.” Id. We concluded that “[w]e see nothing in these circumstances to support the conclusion that a position of private trust between Mullens and his victims was created.” Id. at 1567. But in doing so, we pointed out that “there was no evidence Mullens held himself out as an investment broker, or advertised Omni as an investment brokerage firm.” Id. at 1566 (emphasis supplied). Thus, even the Mullens decision distinguished the investment broker from the general investment and financial advisor. Mullens also did not involve trust bank accounts being utilized as an integral part of the business relationship. This is not a case of an arm’s length commercial relationship but one where the defendant Morris abused the discretionary authority which he knew had been entrusted to him and his co-conspirators by the victims. See United States v. Garrison, 133 F.3d 831, 839 (11th Cir.1998). I, too, would follow Mul-lens, as the majority does, were it not for the fact that Mullens involved a business owner who offered investment opportunities and Mullens itself expressly distinguished that from investment brokerage firms, which is what this scheme involved.
For all of these reasons, I would affirm the § 3B1.3 enhancement.

. I agree with the majority opinion that the government must establish both: (1) that the defendant held a position of public or private trust; and (2) that the defendant abused that position in a way that significantly facilitated the commission or concealment of the offense. U.S.S.G. § 3B1.3.

. Morris did not contest these facts as outlined in the government's proffer during his plea colloquy. Instead, during that plea colloquy Morris expressly agreed that the facts as to his involvement were true and correct. (Plea T. p. 22). As to his co-defendants' conduct, there was also no objection, and his counsel stated: "Mr. Morris naturally doesn't know all of the details of what other individuals were doing. But, we believe Mr. Morris, and I would definitely take the government's word that the activities of the other individuals are true and accurate.” (Sent. T. p. 6). At the second sentencing hearing, the court asked again: "Mr. Morris, do you still admit that you violated the law as set forth in the facts presented by the government when we were here at your plea elocution as to both Counts 1 and 18?” (Sent. T. p. 6). Morris replied, "Yes, I do, Your Honor.” The parties do not dispute the facts but argue about whether the facts were sufficient to warrant the enhancement.

. Because Morris was seeking a reduction for acceptance of responsibility, his attorney emphasized that the objections to the pre-sen-tence report "are totally legal objections. Mr. Morris is not disputing facts or his conduct. He takes full responsibility for his actions.” (T. p. 14). See United States v. Hedges, 175 F.3d 1312, 1315 (11th Cir.1999) (noting defendant “did not object to the statements in the PSI” and thus "these statements were undisputed, and the court was permitted to rely on them despite the absence of supporting evidence”).

. While the pre-sentence report indicated that Brown and Stewart wired $5,315,500 to Morris' account, Morris’ counsel filed objections to the pre-sentence report stating that "[a]c-cording to FBI 'flow charts’ .., [the] total money received during the time period of the indictment is 3.2 million dollars.” (Defendant’s Objections to Pre-Sentence Report, p. 2). Counsel’s objections also stated "the defendant's position was 'that 3.2 million dollars is the total amount involved.' ” (Defendant’s Objections to Pre-Sentence Report, p. 2). The $3.2 million was ultimately the amount the parties agreed went into Morris’ attorney-client trust account.

. The district court did not make individualized findings as to the basis for imposing the abuse of trust enhancement, but the sentence may be upheld as long as the record supports the enhancement. See United States v. Ismond, 993 F.2d 1498, 1499 (11th Cir.1993) (“If the court does not make individualized findings, the sentence may nevertheless be upheld if the record supports the amount of drugs attributed to a defendant”).

. The majority opinion circumscribes Morris' position relative to the victims by emphasizing that his co-conspirators, not Morris, portrayed him as a trader to the victims, that Tolley, not Morris, drafted the forbearance agreement, and that there is no evidence the victims knew about Morris' attorney-client trust account. I disagree with this reading of the record. In my view, the record shows that Morris has admitted that he knew his co-conspirators were falsely representing him as a trader and themselves as brokers, that he was fully aware of his co-conspirators' use of trust accounts to receive the victims’ funds and indeed the victims’ money was wired from those trust accounts to Morris’ trust accounts, and that Morris, along with Tolley, participated in conversations with the investors leading to the forbearance agreement and "maintained contact” with the victims. Morris is not shielded by the acts of his co-conspirators but implicated in all of their conduct both directly and indirectly.