[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 28, 2002
THOMAS K. KAHN
CLERK

No. 01-10955

_____

D. C. Docket No. 99-00055-CR-1-004

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES CHARLES MORRIS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(March 28, 2002)**

Before BARKETT, HULL and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

Defendant-appellant James Charles Morris appeals from the sentence

imposed by the district court after he pleaded guilty to conspiracy to defraud and conspiracy to launder money. In addition to concurrent 97 month terms of imprisonment, Morris faces a three year term of supervised release and was ordered to pay $419,125 in restitution. On appeal, Morris alleges that the district court erred in ordering restitution when it failed to advise Morris of the possibility of an order of restitution before accepting his guilty plea. Morris also contends that the district court erred in imposing a sentence enhancement for abuse of a position of trust.

## I. BACKGROUND

Morris and four others were indicted and charged with various counts stemming from investment fraud. In the scheme, Morris's co-conspirators obtained investors' funds by falsely representing the investments as legitimate high-yield opportunities. The co-conspirators then would use bank wire transfers to send funds to other persons and entities, including Morris, thus concealing the money trail and promoting the investment fraud.

Pursuant to a written plea agreement, Morris pleaded guilty to conspiracy to defraud and conspiracy to launder money, in violation of 18 U.S.C. §§ 371 and 1956(h). The agreement and the plea colloquy informed Morris that he could face the following fines: (1) for conspiracy to defraud, a maximum fine of $250,000 and

2

(2) for conspiracy to launder money, a maximum fine of the greater of $500,000 or twice the value of the transaction. Neither the plea colloquy nor the plea agreement alerted Morris to the fact that he could be sentenced to pay restitution.

The presentence report recommended that Morris receive a two-level enhancement for abuse of a position of trust under U.S.S.G. § 3B1.3. Morris objected to the enhancement, arguing that he did not hold a special position of trust as envisioned by the Guidelines. The government responded that the enhancement was appropriate because Morris had used his attorney trust account to funnel the money in promotion of the fraudulent scheme and the other conspirators had informed the victims that Morris was a trader and an attorney. The court overruled Morris's objection, but did grant a three-level reduction for acceptance of responsibility, which resulted in a base offense level of 28. This adjusted offense level and a criminal history category I led to a Guidelines range of 78 to 97 months. The court sentenced Morris to 97 months imprisonment to be followed by a three-year term of supervised release, and ordered Morris to pay $419,125 in restitution to sixteen victims, jointly and severally with his four co-defendants. Morris did not object at sentencing to the court order to pay restitution. This appeal follows.

## II. DISCUSSION

*A. Rule 11 and Restitution*

Morris asserts that the district court violated Federal Rule of Criminal Procedure 11 by ordering restitution where it failed to advise him, before he pleaded guilty, of the possibility that such an order might be issued. This court reviews the issue of a Rule 11 violation for plain error when it was not raised before the district court. See United States v. James, 210 F.3d 1342, 1343 (11th Cir. 2000). Morris must show that there is (1) "error," (2) that is "plain," and (3) that "affect[s] substantial rights." See United States v. Olano, 507 U.S. 725, 732-34 (1993). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" Johnson v. United States, 520 U.S. 461, 467 (quoting Olano, 507 U.S. at 732) (other internal quotation marks omitted).

The government concedes that Morris was not made aware of the possibility of an order of restitution at either the plea hearing or in the plea agreement.[1] Rule

---

[1]Although Morris was not made aware of the possibility of a restitution order in the plea agreement or at the plea hearing, the government contends that certain actions and inactions by Morris signify that he understood the consequences of his plea. The government points to a letter that Morris wrote to the probation officer, where Morris expressed "I am very sorry for what I have done and can only hope to some how make restitution," and notes that Morris did not object to the presentence report statement that he owed restitution to twenty-four victims. These facts are irrelevant and provide no support for the government's position, for these events occurred *after* Morris pleaded guilty. Failure to object to the presentence report means the

4

11(c) provides:

> Advice to the defendant. Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and inform the defendant of, and determine that the defendant understands, the following:
>
> (1) the nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law, including the effect of any special parole or supervised release term, the fact that the court is required to consider any applicable sentencing guidelines but may depart from those guidelines under some circumstances, and, when applicable, that the court may also order the defendant to make restitution to any victim of the offense.

Fed. R. Crim. P. 11(c). Because the court erred by failing to inform Morris of the possibility of restitution, the next issue is whether or not this error affected his substantial rights. See Fed. R. Crim. P. 11(h) ("Any variance from the procedures required by this rule which does not affect substantial rights shall be disregarded."). "We have identified three core objectives of Rule 11: (1) ensuring that the guilty plea is free of coercion; (2) ensuring that the defendant understands the nature of the charges against him; and (3) ensuring that the defendant is aware of the direct consequences of the guilty plea." United States v. Quinones, 97 F.3d 473, 475 (11th Cir. 1996). "Failure to satisfy any of the core objectives violates

---

sentence is reviewed under the plain error standard, but it does not affect the analysis of what Rule 11 requires.

5

the defendant's substantial rights." Id.

Morris argues that by omitting the possibility of an order of restitution, the court failed to satisfy the concerns of Rule 11 and violated his substantial rights. Both the plea agreement and the plea colloquy, however, informed Morris that he faced a maximum fine of $250,000 on the conspiracy to defraud count and a fine on the conspiracy to launder money count of the greater of $500,000 or twice the value of the transaction. Because Morris faces a restitution order that is below the amount he was informed he could face in fines, the government contends that the his substantial rights were not impaired.

This is a question of first impression for this court. In United States v. McCarty, 99 F.3d 383 (11th Cir. 1996), we concluded that a defendant's substantial rights were not affected when a district court failed to mention specifically the possibility of restitution but the defendant had been fully advised of his obligation to make restitution in the plea agreement. See id. at 386-87. Morris, however, was not made aware of the possibility of restitution in either the plea agreement or the plea hearing.

Although Federal Rule of Criminal Procedure 11(c) requires the district court to explain a defendant's liability for both fines and restitution, we hold that failure to do so does not impact a defendant's substantial rights where he was

6

warned of a potential fine larger than the actual amount of restitution ordered.

Here, the restitution order was considerably less than the fine Morris was warned

of at the time of his guilty plea.  In a case that involved an earlier version of Rule

11, the Supreme Court stated that "matters of reality, and not mere ritual, should be

controlling."  McCarthy v. United States, 394 U.S. 459, 467-68 n.20 (1969)

(citation omitted).  We agree with the holding of seven of the eight circuits to have

ruled on this question that a defendant "is not prejudiced so long as his liability

does not exceed the maximum amount that the court informed him could be

imposed as a fine.  It is the amount of liability, rather than the label 'restitution,'

that affects [a defendant's] substantial rights."  United States v. Glinsey, 209 F.3d

386, 395 (5th Cir. 2000).[2]  Accordingly, we conclude that the district court's

---

[2]See also United States v. Raineri, 42 F.3d 36, 42 (1st Cir. 1994) (holding that error is harmless where defendant is required to pay restitution in an amount less than the potential fine of which he was warned); United States v. Gabriele, 24 F.3d 68, 71 (10th Cir. 1994) (holding that defendant's substantial rights not impaired when ordered to pay $100,000 in restitution when he knew he could be fined up to $750,000); United States v. Fox, 941 F.2d 480, 484-85 (7th Cir. 1991) (holding that decision to plead guilty not prejudiced by court's failure to advise of possibility of restitution when defendant had notice of a possibly greater fine); United States v. Miller, 900 F.2d 919, 921 (6th Cir. 1990) (holding that error was harmless where defendant was required to pay restitution in an amount less than the maximum possible fine amount of which he had knowledge); United States v. Pomazi, 851 F.2d 244, 248 (9th Cir. 1988), overruled in part on other grounds, Hughey v. United States, 495 U.S. 411 (1990) (holding that there is no surprise or prejudice in failure to mention restitution in Rule 11 hearing when defendant was told of potential liability of $500,000 and $64,229 restitution order imposed); United States v. Fentress, 792 F.2d 461, 466 (4th Cir. 1986) (holding that there is no surprise or prejudice by the imposition of $38,000 restitution order when defendant might have been ordered to pay a maximum fine of $40,000).  But see United States v. Showerman, 68 F.3d 1524, 1528 (2d Cir. 1995) (holding that the failure to mention the possibility of restitution at the Rule 11 hearing is not harmless error even when the restitution imposed is less than the maximum fine the

7

failure to mention the possibility of restitution was not plain error.

*B. Enhancement for Abuse of a Position of Trust*

Morris also contends that the district court erred in enhancing his sentence pursuant to U.S.S.G. § 3B1.3 for abuse of a position of trust. The Sentencing Guidelines require a two-level increase of a defendant's base offense level "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S. Sentencing Guidelines Manual § 3B1.3 (2001). "For the adjustment to apply, the government must establish both elements: (1) that the defendant held a place of public or private trust; and (2) that the defendant abused that position in a way that significantly facilitated the commission or concealment of the offense." United States v. Ward, 222 F.3d 909, 911 (11th Cir. 2000). "We review the district court's fact findings for clear error, but its determination whether the facts justify an abuse-of-trust enhancement we review de novo." Id. (quoting United States v. Mills, 138 F.3d 928, 941 (11th Cir. 1998)).

Morris claims that, because he did not occupy a position of public or private trust, the enhancement was erroneous. Morris was represented to the victims by his co-conspirators as a professional trader and a licensed attorney, both of which

defendant understood he might receive).

8

the government claims are positions of public trust. The government further contends that Morris "abused those positions when he convinced the victims of the fraud to invest or continue in their investments and by using his attorney trust account to receive, launder and transfer monies," thereby significantly facilitating the commission of the crime.

This argument is insufficient to merit the enhancement. The government states that the enhancement was appropriate because Morris was "represented" and "described" as an attorney and trader, and points to our statement that the "determination of whether a defendant occupied a position of trust that would warrant this enhancement is assessed from the perspective of the victim of the crime." United States v. Garrison, 133 F.3d 831, 837 (11th Cir. 1998). Because the co-conspirators represented Morris as an attorney and trader, the government asserts that he occupied a position of trust from the victims' perspective.

The government's argument misreads the Sentencing Guidelines. Under the government's view of § 3B1.3, Morris would face a two-level enhancement to his sentence because of the representations of others. However, "the structure of the sentencing guidelines compels the conclusion that the abuse of trust enhancement must be based on an individualized determination of each defendant's culpability." United States v. Moore, 29 F.3d 175, 179 (4th Cir. 1994). The provisions of Part B

9

of Chapter Three of the Sentencing Guidelines, "Role in the Offense," provide for "adjustments to the offense level based upon the role the defendant played in committing the offense." U.S.S.G. ch. 3, pt.B, introductory cmt. (2001). "By their very nature, the role in the offense adjustments cannot be based upon the actions of co-conspirators." Moore, 29 F.3d at 179. Here, the government contends that the co-conspirators represented Morris to be a trader and attorney. The language and structure of the Guidelines prevents application of the § 3B1.3 enhancement to Morris based upon the representation of others.[3]

Both the Government's statement of facts presented at the plea colloquy[4] and the probation officer's presentence report reveal evidence that the government could have presented to bolster its argument for the § 3B1.3 enhancement.[5] This is especially true given that this case involved a guilty plea and therefore the record is quite limited. According to the statement of facts, Morris portrayed himself as a

---

[3] The dissent lists statements from the presentence report that, although adding information related to the underlying fraud, do not relate to the question of whether Morris occupied a position of trust relative to the victims. The dissent notes that Tolley, a co-conspirator, "even drafted an agreement to convince the victims to forego legal action against him and Morris in return for fixed dates of repayment." Dissent at 28. Again, this is relevant to the underlying fraud, but is not relevant to the determination of whether Morris occupied a position of trust.

[4] At the plea colloquy Morris accepted the statement of facts, with minor modifications offered by his attorney that are not relevant here.

[5] The government did discuss some of this evidence at oral argument, but did not utilize this evidence in the argument presented in its brief.

10

trader who had conducted successful multi-million dollar international bank trades in the past.[6] The statement further relates that, after the initial investments, investors "contacted and maintained contact" with Morris directly. Furthermore, Morris and two other co-conspirators allegedly called a victim numerous times and advised, "The money is on the way." The probation office conducted follow-up telephone calls to victims and reported the results in an addendum to the presentence report.[7] One victim stated that after her initial investment, she "later spoke directly with the defendant who confirmed he was a practicing attorney." A second victim interviewed related that he was "introduced to the defendant through co-defendant Brown, who identified the defendant as being an attorney and the investor or 'trader.'" Morris identified himself to a third victim as the trader and "indicated he was going to get him a big return on his investment."

"Determining what constitutes a position of trust for the purposes of § 3B1.3 is not a simple task." United States v. Iannone, 184 F.3d 214, 222 (3d Cir. 1999). In addition to the Guidelines' lack of a clear definition of what constitutes a

---

[6]The context of this sentence indicates that this statement relates to his dealings with co-conspirators, not that Morris portrayed himself as a trader to the victims. This assessment is bolstered by the probation officer's presentence report, which states: "Morris was falsely portrayed to investors, by co-conspirators Calvin F. Brown and Robert Charles Stewart, as a sophisticated 'trader' of currency and bank instruments in the international financial community."

[7] Although the district court did not make findings of fact, it did adopt the presentence report at Morris's sentencing hearing.

11

position of trust, see id.; United States v. Mullens, 65 F.3d 1560, 1566 (11th Cir. 1995), the determination of whether to apply the enhancement is highly dependent on the specific facts in each situation. See United States v. Hart, 273 F.3d 363, 375 (3d Cir. 2001). Although the facts here make the question of the applicability of § 3B1.3 difficult, we conclude that, based upon Eleventh Circuit precedent, the evidence is not enough to justify the enhancement in this case. There is no doubt that the statements attributed to Morris were integral to the fraud itself, but that is insufficient to justify the enhancement. See Mullens, 65 F.3d at 1567 ("Often there is a component of misplaced trust inherent in the concept of fraud."); United States v. Koehn, 74 F.3d 199, 201 (10th Cir. 1996) ("In every successful fraud the defendant will have created confidence and trust in the victim, but the sentencing enhancement is not intended to apply in every case of fraud."). Morris may have abused the trust of the victims, but that is not the inquiry here. The initial question is whether or not Morris occupied a position of trust. See Mullens, 65 F.3d at 1567 ("One must hold a position of trust before it can be abused, however.").

Morris's status as an attorney (in actuality, a non-practicing attorney) does not necessarily mean he abused a position of trust. Although attorneys are expected to abide by ethical standards, it simply is not the case that an attorney holds a position of trust with respect to all people with whom he comes into

contact solely by virtue of his status as an attorney. Morris did not have an attorney-client relationship with any of the victims. Although Morris's status as an attorney may have been used to develop the trust of the victims, there are no facts to support the conclusion that as an attorney Morris occupied a position of trust in relation to these victims.[8]

The fact that Morris used an attorney trust account also does not merit application of the § 3B1.3 enhancement. There was no commingling of these funds with non-related funds and the account was not otherwise used. None of the victims had any connection to the attorney trust account, and there is no allegation that any knew of its existence.[9] Instead, the victims wired or sent their funds not to Morris, but to his co-conspirators. The co-conspirators in turn would transfer these funds to Morris's attorney trust account. Morris then would immediately transfer

---

[8] This does not provide a great deal of shelter from the § 3B1.3 enhancement for attorneys who commit fraud. This analysis would be different if the situation involved an attorney who abuses the trust of a client. See U.S.S.G. § 3B1.3, cmt. 1 ("This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian."); see also United States v. Walker, 191 F.3d 326, 338 (2d Cir. 1999) ("As a general matter, an attorney occupies a position of trust with regard to his clients."). Furthermore, fraud committed by attorneys outside the context of a client relationship can merit an enhancement under the "special skill" provision of § 3B1.3, which specifically mentions lawyers in the list of examples. U.S.S.G. § 3B1.3, cmt. 3. As the government did not raise the special skill provision in the district court or in its brief, it is not discussed here.

[9] If there was any evidence that the use of this attorney trust account acted to "engender the victims' trust," dissent at 27, or "foster that trust," dissent at 28, the analysis would be different. However, there is no evidence that the victims were aware of the attorney trust account.

13

various amounts of these commingled funds to other bank accounts in his name or the names of other persons or businesses. Therefore, the use of this account does not place Morris in a position of trust with respect to the victims of the fraud. We need not discuss whether the use of the attorney trust account "significantly enhanced the commission or concealment of the offense" because the first element required, that the defendant held a position of trust, has not been established.[10]

Some evidence supports a claim that Morris represented himself as a trader to the victims. A § 3B1.3 enhancement has been applied in situations involving brokers or financial advisors. See, e.g., Hart, 273 F.3d at 377-78; United States v. Bollin, 264 F.3d 391, 415-16 (4th Cir. 2001); United States v. Davuluri, 239 F.3d 902, 909 (7th Cir. 2001); United States v. Hirsch, 239 F.3d 221, 227-28 (2d Cir. 2001). The Guidelines provide, "'Public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion." U.S.S.G. § 3B1.3, cmt. 1.[11] The role of a financial advisor or broker is impossible

---

[10]Although agreeing that the government must establish (1) that Morris held a position of public or private trust, and (2) that Morris abused that position in a manner significantly facilitating the commission or concealment of the offense, see dissent at 19 n.1, the dissent uses evidence that speaks to the second prong to address the first prong. Whether or not the use of Morris's attorney trust account facilitated or concealed the scheme is not relevant to the first prong, unless there is evidence that the victims knew of the use of the attorney trust account and derived some measure of trust from the use of such an account. The record provides no such evidence.

[11] The Supreme Court has held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is

14

to classify in general. The Third Circuit has stated:

> [I]t seems apparent that the responsibilities and discretion exercised by stockbrokers spans the spectrum. At the one end are brokers who exercise authority and discretion over an account and have the power to make sales or take actions on behalf of a customer without specific direction. . . . At the other end are brokers who mechanically execute trades requested by customers.

Hart, 273 F.3d at 377. Each situation involving a financial advisor must therefore be analyzed individually.

Even assuming arguendo that Morris portrayed himself as a trader and had complete discretion over the victims' funds, Eleventh Circuit case law requires more before the enhancement will apply. The guiding precedent is Mullens, which also involved the applicability of the § 3B1.3 enhancement in a situation involving investment fraud. 65 F.3d 1560 (11th Cir. 1995). In Mullens, the defendant was "the head and sole stockholder in Omni," "his representations of being a financial advisor . . . encouraged investors to put their life savings into Omni," and he had "total control" over all funds. Id. at 1566. He "sold investment opportunities in the form of shares, contract rights, and participation rights in limited partnerships. Mullens told investors the limited partnerships were formed to purchase and sell small, privately held companies for a profit. In reality, Omni was a ponzi scheme."

---

inconsistent with, or a plainly erroneous reading of, the guideline." Stinson v. United States, 508 U.S. 36, 37-38 (1993).

<u>Id</u>. at 1562.

Although "Mullens may have touted himself as a 'gifted advisor who the Omni investors could trust' and an 'investment and financial advisor,'" we held that "[w]e see nothing in these circumstances to support the conclusion that a position of private trust between Mullens and his victims was created." <u>Id</u>. at 1567. <u>Mullens</u> thus requires more than control or discretion to justify the § 3B1.3 enhancement. As explained there, "Fraudulently inducing trust in an investor is not the same as abusing a bona fide relationship of trust with that investor." <u>Id</u>.

The facts here are very similar to those in <u>Mullens</u>. The scheme involving Morris consisted of representations by the conspirators that the investors would receive very large returns on currency, bank-note, and bank debenture trading programs. Mullens enticed victims to invest in limited partnerships, which he claimed were formed to purchase and sell small, privately held companies for profit. Both Mullens and Morris had complete control of the victims' money, and each promised a large return based on their abilities.[12]

What constitutes a bona fide relationship of trust is not amenable to precise

---

[12]As the dissent notes, we stated in <u>Mullens</u>: "To our knowledge, however, there was no evidence Mullens held himself out as an investment broker, or advertised Omni as an investment brokerage firm." 65 F.3d 1560, 1566 (11th Cir. 1995). However, the next sentence in <u>Mullens</u> states, "If he had run a legitimate but unprofitable enterprise, Mullens would have been considered nothing more than a business owner who offered investment opportunities to the public that soured." <u>Id</u>. at 1566-67. That is also true in the case at hand.

16

definition. We explained in Mullens that the defendant did not occupy a position of trust with respect to investors he cultivated at a country club where there was no evidence "suggesting that Mullens had a special, close, or personal attachment, or fiduciary relationship with any member of the country club." Id. at 1566. Although we do not require the relationship to satisfy the legal definition of a fiduciary, United States v. Kummer, 89 F.3d 1536, 1547 (11th Cir. 1996), we have stated that the "guideline enhancement requires more than a mere showing that the victim had confidence in the defendant. Something more akin to a fiduciary function is required." United States v. Garrison, 133 F.3d 831, 838 (11th Cir. 1998) (quoting United States v. Brunson, 54 F.3d 673, 678 (10th Cir. 1995)). Garrison also quotes a similar statement from the Sixth Circuit: "[A]s used in the guideline, 'position of public or private trust' is a term of art, appropriating some of the aspects of the legal concept of a trustee or fiduciary." 133 F.3d at 839 (quoting United States v. Ragland, 72 F.3d 500, 503 (6th Cir. 1996)). We need not elaborate on what constitutes a bona fide relationship of trust because the facts in this case do not prove that Morris had more of a relationship of trust with his victims than did the defendant in Mullens. We acknowledge that other circuits that have considered the abuse of trust enhancement under similar facts have not

17

followed <u>Mullens</u>.[13] However, this panel is bound by <u>Mullens</u> as Eleventh Circuit precedent unless reversed by the Supreme Court or this court en banc. Therefore, the enhancement for abuse of trust was improper.

### III. CONCLUSION

The restitution order is AFFIRMED. We REVERSE and REMAND for resentencing without enhancement for abuse of a position of trust.

---

[13]The Seventh Circuit has explicitly criticized <u>Mullens</u>. In <u>United States v. Davuluri</u>, that court stated: "To the extent that <u>Mullens</u> . . . holds that a financial advisor with total control over investors' funds does not occupy a position of trust, we respectfully decline to follow that decision as inconsistent with our own case law." 239 F.3d 902, 909 (7th Cir. 2001); <u>see also</u> <u>United States v. Bollin</u>, 264 F.3d 391, 416 (4th Cir. 2001) (finding position of trust existed where victims provided defendant with discretion to invest and expected defendant "to make trades in their best interest, which he did not do"); <u>United States v. Reeves</u>, 255 F.3d 208, 212 (5th Cir. 2001) (finding position of trust where defendants presented themselves as financial planners and defrauded victims by persuading them to turn over money to be invested in sham companies); <u>United States v. Iannone</u>, 184 F.3d 214, 224 (3d Cir. 1999) (holding that position of trust existed where defendant's "position as head of a company in which the victims invested made his fraud difficult to detect, vested him with significant authority over the victim's investment monies, and encouraged his victims to rely on his perceived integrity"); <u>United States v. Lowder</u>, 5 F.3d 467, 473 (10th Cir. 1993) (finding that the president of a bogus financial company who was entrusted with the ability to spend the investors' money without any oversight held a position of trust); <u>United States v. Tardiff</u>, 969 F.2d 1283, 1289 (1st Cir. 1992) ("Virtually by definition, a money manager or financial advisor who is entrusted with, and who proceeds fully to exercise, broad discretionary powers in respect to other peoples' money occupies a position of private trust.").

HULL, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority opinion as to Rule 11 and Restitution, but disagree with its reversal of the two-level enhancement for abuse of a position of trust under U.S.S.G. § 3B1.3. In my view, Morris held a position of private trust in this broker-trader scheme and abused that position to facilitate both the commission and concealment of the offense.[1] Our precedent has not answered whether persons who are engaged in a brokerage-trading business and who utilize trust bank accounts as an integral part of that business occupy a position of private trust. I would hold they do.

I first review the undisputed facts which show that Morris and his co-conspirators not only purported to operate a brokerage-trading business, characterized by professional and managerial expertise and discretion, but also used various trust bank accounts for their clients' funds in order to facilitate and conceal the scheme. The undisputed facts are in three places in the record: (a) the statement of facts filed with the plea agreement and then recited during the plea colloquy; (b) the pre-sentence report; and (c) admissions during the sentencing hearing. The facts filed with the plea agreement (and recited almost verbatim

---

[1] I agree with the majority opinion that the government must establish both: (1) that the defendant held a position of public or private trust; and (2) that the defendant abused that position in a way that significantly facilitated the commission or concealment of the offense. U.S.S.G. § 3B1.3.

19

during the plea colloquy) are as follows:[2]

> During the conspiracy charged in the indictment, [defendants] George Melvin Bevre, Calvin Fredrick Brown, Robert Charles Stewart, James C. Morris and Royce Edward Tolley conducted fraudulent investment programs to obtain money from unsuspecting investors by using the telephone, facsimiles, wire transfers of funds, and the United States Mail.
> The five defendants induced potential investors to invest in a variety of programs and made false and fraudulent representations by wire and mail to defraud investors throughout the United States and to launder money through a fund rotation scheme, and used bank accounts in Minnesota, Nevada, California, Colorado, Maryland, Alachua County, Florida, and in foreign countries to move and conceal the investors' funds.
> They also engaged in a technique common in fraudulent schemes called "layering," whereby individuals fraudulently obtain funds from investors and pass a portion on to other companies and individuals, who claim not to be "the person investing the funds," and can then ostensibly cast blame on others to whom investors' money was sent. In such frauds, layering and the "blame game" continue endlessly to stall, frustrate and eventually defeat investors who seek just compensation.
> The scheme in this case consisted of fraudulent promises and representations by the defendants that investors would receive exorbitant returns on their investments in purported currency, bank-note and bank debenture trading programs.

---

[2] Morris did not contest these facts as outlined in the government's proffer during his plea colloquy. Instead, during that plea colloquy Morris expressly agreed that the facts as to his involvement were true and correct. (Plea T. p.22). As to his co-defendants' conduct, there was also no objection, and his counsel stated: "Mr. Morris naturally doesn't know all of the details of what other individuals were doing. But, we believe Mr. Morris, and I would definitely take the government's word that the activities of the other individuals are true and accurate." (Sent. T. p.6). At the second sentencing hearing, the court asked again: "Mr. Morris, do you still admit that you violated the law as set forth in the facts presented by the government when we were here at your plea elocution as to both Counts 1 and 18?" (Sent. T. p.6). Morris replied, "Yes, I do, Your Honor." The parties do not dispute the facts but argue about whether the facts were sufficient to warrant the enhancement.

In truth, the "investment programs" either did not exist or were of such dubious existence that the defendants' failure to perform due diligence and their promises of investment returns constituted, at a minimum, willful blindness.

The defendants obtained investors' funds by making false representations and using other persons to falsely represent to investors that the "programs" were legitimate high-yield opportunities in the world of international finance.

Once the investors' funds went into the defendants' bank accounts, the defendants would use bank wire transfers to send funds to other persons and entities throughout the world to conceal the money trail and to promote the investment fraud.

. . .

From June 1996 through June 1997, . . . Bevre made false representations to entice funds from persons to invest in fictitious currency and bank debenture trading programs, and caused those funds to be deposited into his Global Funding account at various financial institutions.

. . .

From late 1996 through April 1997, Brown and Stewart, using the names TKO Maintenance and Ventura Enterprises, made false and misleading representations to obtain funds from investors through the United States mail and bank wire transfers.

Between May 9, 1997 and May 15, 1997, George Melvin Bevre wire transferred 1.5 million dollars from his Global Funding trust account at Calvert Shareholder Services, a division of the Calvert Group mutual fund management firm in Baltimore, Maryland. Bevre sent five hundred thousand dollars to Brown's Roman Carlos Trust bank account at the Levy County State Bank in Chiefland, Florida, and one million dollars to Stewart's Jonathan Mencken Trust bank account at the Barnett Bank in Gainesville, Florida.

Brown and Stewart each took approximately three hundred thousand dollars from those accounts and wire transferred to it to accounts they controlled in Antigua, British West Indies, from which they wire transferred funds back into the United States and used for their own benefit.

After receiving the $1.5 million from Bevre and skimming 600 thousand dollars from that and other investors' funds in the Roman

Carlos Trust and Jonathan Mencken Trust accounts, Brown and Stewart wired 1.2 million dollars to James C. Morris, a non-practicing attorney in Gardnerville, Nevada.

Morris portrayed himself as a "trader" who conducted successful multimillion dollar international bank trades in the past. Morris has been involved as an alleged "trader" with Stewart in February 1997, when Brown and Stewart each took $50,000 from a purported investment of four hundred thousand dollars wire transferred to them. After receiving the funds from Brown and Stewart in May 1997, Morris commingled them in three of his bank accounts with other moneys he had fraudulently obtained, and wire transferred hundreds of thousands of dollars to Royce E. Tolley, then an attorney in Castle Rock, Colorado.

Tolley has since been disbarred by the Colorado Bar for fraudulent activities with clients. Both Morris and Tolley used attorney-client trust accounts to receive and transfer funds obtained by fraudulent representations.

Tolley also received wire transfers from Morris in Tolley's Echo Hills Swim and Tennis Club account.

When Brown's investors pressured him about their investments during the summer of 1997, he advised them that their money had been sent to Morris and that Morris had transferred some of their money to Tolley. The investors then contacted and maintained contact with Morris, Tolley, and Brown.

Tolley contacted investors of Brown and Stewart and told them that he, Tolley, and James C. Morris were attempting to find and return the investors' money. In November 1997, Tolley sent investors a nine-page document titled: "Assignment of Interest in Joint Venture Non-Circumvention and Fee Agreement."

Paragraph 3.G of that document reads:

> By its signature(s) hereto, Brown (all members of the Brown group) agrees to forego any and all legal, civil or criminal, that it or any person or entity has against James C. Morris, Royce E. Tolley, Allen Clark, Pacific Bank AIU, or any other person with regard to the 1.2 million dollars transferred by Brown's group to Morris for investment purposes on the condition that Brown's group receives the 1.2 million on or before December 15th, 1997, and the remaining 3.6 million on or before February

22

1, 1998.

In a letter to Calvin Brown dated December 7, 1997, Tolley stated that he had "in place" financial transactions totalling more than three billion dollars, and that "I have a lot on the table and I believe we will work our way through these very soon."
Tolley's November agreement and his December letter were simply stalling tactics to keep Brown's investors from going to law enforcement authorities because neither he, Morris, Brown nor Stewart had the means or intention to pay any investor.

From November 1997 through February 1998, an investor who gave Brown twenty-five thousand dollars in April 1997, received numerous telephone calls from Brown, Morris and Tolley in which they continually stated: "The money is on the way," and that it would be deposited into Stewart's offshore accounts for payment of principal and interest to the investors.
Morris also told the investor that he had cancer and was on dialysis. This investor and numerous other investors never received an interest payment or return of their principal.

Morris was interviewed by the FBI and admitted that Brown and Stewart had wire transferred 1.2 million dollars to him, but gave an excuse that the investment that he had planned was not workable. He also said Brown and Stewart had given him authorization to invest the money in whatever venture Morris felt would return a high yield. Morris said the money was to go towards the purchase or lease of 25 million dollars in Treasury bonds.

Tolley was also interviewed and stated that he had dealt with Morris in investment ventures in 1997. He said Brown called him in October or November 1997 about the 1.2 million dollars given to Morris. Tolley admitted Morris gave him at least six hundred thousand dollars of that money in June 1997. He also admitted that he talked to two of Brown's investors and prepared an agreement in which he agreed to pay the two investors twenty-five thousand dollars each.

The loss to investors during the charged mail fraud, wire fraud, and money laundering conspiracies was approximately 1.6 million dollars. The individual defendants received from approximately two hundred thousand dollars to six hundred thousand dollars from their fraudulent activities; the precise figure for each defendant will be

23

determined prior to sentencing.

(Plea T. pp.15-21).

The pre-sentence report also outlined the offense conduct in similar detail.

These undisputed facts are taken from that report:[3]

> 31.     James C. Morris is an attorney licensed by the State Bar of California, whose residence was in Gardnerville, Nevada. During the instant offense, Morris was falsely portrayed to investors, by co-conspirators Calvin F. Brown and Robert Charles Stewart, as a sophisticated "trader" of currency and bank instruments in the international financial community. When Morris received wire transferred funds from Brown and Stewart, he would commingle those funds with other funds in his bank account and would immediately transfer various amounts of those funds to other bank accounts in his name and in the names of other persons and alleged business entities, thus rotating the funds to conceal them and prevent the funds from being traced. Morris would then transfer the remaining funds to co-conspirator Royce Edward Tolley, an attorney in Castle Rock, Colorado. Tolley would continue the rotation of the funds, while retaining a portion of the funds for his personal use.

> 36.     Bevre, also known as George Hart, was the owner and controller of Global Funding Limited Trust. This trust was created on or about June 13, 1996, and had bank accounts at the First American Bank of Breckenridge, in

---

[3] Because Morris was seeking a reduction for acceptance of responsibility, his attorney emphasized that the objections to the pre-sentence report "are totally legal objections. Mr. Morris is not disputing facts or his conduct. He takes full responsibility for his actions." (T. p.14). See United States v. Hedges, 175 F.3d 1312, 1315 (11th Cir. 1999) (noting defendant "did not object to the statements in the PSI" and thus "these statements were undisputed, and the court was permitted to rely on them despite the absence of supporting evidence").

24

Breckenridge, Minnesota and at Calvert Shareholder Services, in Baltimore, Maryland. These accounts were used by Bevre/Hart to deposit and withdraw funds obtained from the fraudulent scheme.

38. Brown was a resident of Levy County, Florida and was a signatory and controller of the Roman Carlos Trust and Barco Resources Limited accounts. The Roman Carlos Trust account was obtained through the Passport Society, which provided for the creation of a "colato", allegedly under the law of Antigua, BWI. The Passport Society is an offshore investment company that sets up trust accounts, international corporations, etc.

39. Brown and co-conspirator Robert C. Stewart operated as promoters/brokers. They induced potential investors to invest in a variety of programs and made false and fraudulent representations to investors in order to facilitate the fraud scheme. The funds obtained by the fraud scheme were then laundered through a fund rotation or "shell game."

41. Stewart was a resident of Gainesville, Florida, and a signatory and controller of the Jonathon Mencken Trust and Bittner Group, Limited. The Jonathon Mencken Trust was obtained through the Passport Society, which provided for the creation of a "colato", allegedly under the laws of Antigua, BWI. Stewart and co-conspirator Calvin F. Brown operated as promoters/brokers. They induced potential investors to invest in a variety of programs and made false and fraudulent representations to investors in order to facilitate the fraud scheme.

43. Tolley was a practicing attorney who resided in Denver and Castle Rock, Colorado. Tolley received wire transfers from co-conspirator James C. Morris.

At the sentencing hearing, Morris' counsel also acknowledged that "Mr

25

Morris was a licensed attorney. He had an attorney trust fund that was established. All of the money that was received by Mr. Morris mainly from co-defendants, not directly from quote victims, went into that account" and that "there was no other funds in that account." (Sent. T. p.12). Morris admitted to receiving $3.2 million in his attorney-client trust fund account.[4]

Considered together, these undisputed facts reveal that Morris and his co-conspirators operated as a brokerage-trading business that was characterized by professional and managerial expertise and discretion and that utilized various trust accounts to engender trust and to facilitate the scheme and delay discovery of the fraud. Stewart, Brown, and Bevre represented themselves as professional brokers. During his plea colloquy, Morris admitted that "Morris portrayed himself as a trader who conducted successful multimillion dollar international bank trades in the past." Morris also did not object to the pre-sentence report's statement acknowledging that his co-conspirators also portrayed him that way to the investors. Specifically, the pre-sentence report stated that "[d]uring the instant

---

[4] While the pre-sentence report indicated that Brown and Stewart wired $5,315,500 to Morris' account, Morris' counsel filed objections to the pre-sentence report stating that "[a]ccording to FBI 'flow charts' . . . [the] total money received during the time period of the indictment is 3.2 million dollars." (Defendant's Objections to Pre-Sentence Report, p.2). Counsel's objections also stated "the defendant's position was "that 3.2 million dollars is the total amount involved." (Defendant's Objections to Pre-Sentence Report, p.2). The $3.2 million was ultimately the amount the parties agreed went into Morris' attorney-client trust account.

offense, Morris was falsely portrayed to investors, by co-conspirators Calvin F. Brown and Robert Charles Stewart, as a sophisticated 'trader' of currency and bank instruments in the international financial community."

Morris also admitted he and the co-conspirators utilized various trust bank accounts as part of the scheme and rotated the funds through many bank accounts, including those trust accounts. The investor clients wired their money usually to one of these three trust accounts: (a) Global Funding Trust; (b) Roman Carlos Trust; and (c) Jonathan Mencken Trust. Bevre's Global Funding trust account was at Calvert Shareholder Services, a division of the Calvert Group mutual fund management firm in Baltimore, Maryland. From these trust accounts, at least $3.2 million in funds were wired to Morris' attorney-client trust account. Some of the money was then wired by Morris to Tolley's attorney-client trust account. These various trust accounts not only helped legitimize the transactions and engender the victims' trust but also helped conceal, prevent, and delay the tracing of the funds and discovery of the fraud.

When the investor clients pressured Morris, the "investors then contacted and maintained contact with Morris, Tolley and Brown." The blame game and stalling were also part of the overall brokerage-trading scheme to provide time to conceal the funds and defeat any recovery of the funds. When the investor clients

pressured Tolley and Morris, Tolley (a practicing attorney) even drafted an agreement to convince them to forego legal action against him and Morris in return for fixed dates of repayment.

Based on these undisputed facts, I would affirm the two-level enhancement under U.S.S.G. § 3B1.3 for several reasons.[5] First, the fact that no legitimate brokerage-trading firm or business existed does not preclude the enhancement. Instead, we must consider the case as if this was a legitimate investment brokerage firm or business with professional brokers and traders, who traded currency and bank notes in the international financial markets and who were entrusted with the discretion to invest clients' funds and used various trust accounts to foster that trust. Even though Morris may not have had a traditional attorney-client relationship, the fact that he and his co-conspirators used numerous trust accounts as part of the overall scheme may still be considered.[6]

---

[5] The district court did not make individualized findings as to the basis for imposing the abuse of trust enhancement, but the sentence may be upheld as long as the record supports the enhancement. See United States v. Ismond, 993 F.2d 1498, 1499 (11th Cir. 1993) ("If the court does not make individualized findings, the sentence may nevertheless be upheld if the record supports the amount of drugs attributed to a defendant").

[6] The majority opinion circumscribes Morris' position relative to the victims by emphasizing that his co-conspirators, not Morris, portrayed him as a trader to the victims, that Tolley, not Morris, drafted the forbearance agreement, and that there is no evidence the victims knew about Morris' attorney-client trust account. I disagree with this reading of the record. In my view, the record shows that Morris has admitted that he knew his co-conspirators were falsely representing him as a trader and themselves as brokers, that he was fully aware of his co-conspirators' use of trust accounts to receive the victims' funds and indeed the victims' money

28

Second, the position of trust issue has been decided and developed on a case-by-case basis, and we have not answered the position of trust issue specifically as to investment brokerage business with professional brokers and traders using trust accounts.

Third, our precedent supports the enhancement where the defendant occupies a position characterized by professional and managerial discretion. For example, in United States v. Kummer, 89 F.3d 1536 (11th Cir. 1996), we explained that "the abuse of trust enhancement only requires a finding that defendant possessed a position 'characterized by professional or managerial discretion' which 'contributed in some significant way to facilitating the commission of the offense.'" Id. at 1547 (quoting U.S.S.G. § 3B1.3, comment. (n. 1)). In Kummer, the defendant Oglesby "attack[ed] the factual finding that he was in a position of trust, noting that he was not a 'fiduciary of the benefit plan or labor organization' as specified in § 2E5.1(b)(1)." Id. In affirming the two-level increase under § 3B1.3, we concluded that "[i]n his position as a union official" Oglesby had professional or managerial discretion, and that "his position significantly contributed to facilitating the commission of the offense in this case." Id.

was wired from those trust accounts to Morris' trust accounts, and that Morris, along with Tolley, participated in conversations with the investors leading to the forbearance agreement and "maintained contact" with the victims. Morris is not shielded by the acts of his co-conspirators but implicated in all of their conduct both directly and indirectly.

In <u>United States v. Ward</u>, 222 F.3d 909 (11th Cir. 2000), this Court also observed that "[t]he commentary to § 3B1.3 tells us that the phrase '[p]ublic or private trust refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).'" <u>Id.</u> at 911 (citing U.S.S.G. § 3B1.3, comment. (n. 1)).  In <u>Ward</u>, we further noted that the commentary also advises "that people in such positions 'ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.'" <u>Id.</u>  The defendant in <u>Ward</u> was an armored car guard who was convicted of stealing money from the armored cars he guarded during the pick-up and delivery of bank deposits.  <u>Id.</u> at 910.  We concluded the abuse of trust enhancement did not apply because the guard was given no discretion and his position was comparable to an ordinary bank teller or hotel clerk position.  <u>Id.</u> at 912-13.  In contrast, investment brokerage firms or businesses are entrusted with broad discretionary authority to manage the funds of their clients through the application of specialized, professional knowledge.

I recognize that in <u>United States v. Mullens</u>, 65 F.3d 1560 (11th Cir. 1995), we concluded that the defendant Mullens was not in a position of trust by touting himself as a "'gifted investor who the Omni investors could trust' and an

30

'investment and financial advisor.'" Id. at 1566-67. We noted that if he had run legitimate businesses, then "Mullens would have been considered nothing more than a business owner who offered investment opportunities to the public that soured." Id. We concluded that "[w]e see nothing in these circumstances to support the conclusion that a position of private trust between Mullens and his victims was created." Id. at 1567. But in doing so, we pointed out that "there was no evidence Mullens held himself out as an investment broker, or advertised Omni as an investment brokerage firm." Id. at 1566 (emphasis supplied). Thus, even the Mullens decision distinguished the investment broker from the general investment and financial advisor. Mullens also did not involve trust bank accounts being utilized as an integral part of the business relationship. This is not a case of an arm's length commercial relationship but one where the defendant Morris abused the discretionary authority which he knew had been entrusted to him and his co-conspirators by the victims. See United States v. Garrison, 133 F.3d 831, 839 (11th Cir. 1998). I, too, would follow Mullens, as the majority does, were it not for the fact that Mullens involved a business owner who offered investment opportunities and Mullens itself expressly distinguished that from investment brokerage firms, which is what this scheme involved.

For all of these reasons, I would affirm the § 3B1.3 enhancement.